[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13961

_____

D.C. Docket No. 0:12-cv-62406-WJZ

JEFFREY STANLEY,

Plaintiff - Appellant,

versus

BROWARD COUNTY SHERIFF,
Scott Israel, in his official capacity,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 14, 2016)

Before MARCUS and DUBINA, Circuit Judges, and GOLDBERG,[*] Judge.

_____

[*] Honorable Richard W. Goldberg, Judge for the United States Court of International Trade, sitting by designation.

MARCUS, Circuit Judge:

Florida law requires the counties of the state to designate a chief correctional officer (CCO), but it gives counties broad discretion to decide who that officer may be. Thus, for example, a county may (but need not) choose to designate its sheriff as its CCO, so long as it selects someone for that position. The sheriff as CCO may then hire and fire deputies to assist him with his responsibilities, and he may therefore face liability for personnel decisions that violate an employee's constitutional rights. However, if the sheriff was acting as an arm of the state, he will be immune from suit in federal court on account of the Eleventh Amendment. Whether a sheriff acts as an arm of the state is a function-specific determination that is based heavily on a detailed analysis of state law, and is often a difficult question, as it is here.

This case arises from the Broward County Sheriff's potential liability under § 1983 for failing to rehire a former deputy allegedly due to his political loyalties and in violation of his First Amendment rights. Broward County has expressly designated its sheriff as its CCO; thus, at issue in this case is the basic question whether a Florida county sheriff, acting in his capacity as chief correctional officer in the hiring and firing of his deputies, is an arm of the state entitled to the benefit

2

of the state's Eleventh Amendment immunity from suit in federal court.  After careful review, and having the benefit of oral argument, we conclude that a Florida sheriff is not an arm of the state when acting in this capacity.  We, therefore, reverse the district court's grant of summary judgment for the Sheriff and remand to the district court for further proceedings consistent with this opinion.

## I.

The plaintiff, Jeffrey Stanley, worked for the Broward County Sherriff's Office (BSO) as a cross-certified detention deputy -- a deputy sheriff who is also certified to partake in specific law enforcement duties such as maintaining perimeter posts and transporting certain prisoners.  Stanley worked for the BSO for six years before voluntarily resigning in December 2007 to take a position as director of security at a new hospital in Miami Beach.  The hospital was scheduled to open in January 2008, but it failed to open as planned, and, in May 2008, Stanley applied to be rehired at his same position with the BSO.

When a former employee is rehired, BSO policy sets his pay grade lower than it was at the time he left.  This policy was apparently designed to deter law enforcement officers from moving to other law enforcement agencies and then returning if they failed their training or certification requirements.  Stanley found out about this policy upon reapplication, but he believed that the policy should not have applied to him since he did not leave BSO for a different law enforcement

3

agency.  He expressed his dissatisfaction with the policy and contacted union representatives, BSO Human Resources, and then-Sheriff Al Lamberti himself to voice his concerns.  Nonetheless, Stanley was extended and then accepted a conditional offer of employment as a detention deputy at the lower pay grade on September 25, 2008.  This offer was contingent on successful mental and physical evaluations and a final review of his file.

At the time of Stanley's application for rehire, Sheriff Lamberti was running for reelection against his political adversary, Scott Israel.  The Federation of Public and Private Employees, Stanley's union, chose to endorse Israel.  Stanley openly supported Israel's campaign, allegedly due in part to his disappointment with the rehire pay policy.  Stanley attended an informal union picket in front of the BSO with approximately five hundred union members while wearing a "Cops for Israel" t-shirt.  Later that evening, he attended a televised debate between Lamberti and Israel while wearing a different "Cops for Israel" t-shirt.  At both events, BSO photographers took pictures of the attendees; Stanley appeared in some of these photographs.  Stanley also volunteered for the Israel campaign in the weeks leading up to the election.

Lamberti was reelected on November 4, 2008.  On December 4, 2008, Stanley spoke with his former supervisor to inform her that he had satisfied his end of the conditions of his employment offer.  Later that day, Stanley received a

4

phone call from then-Lieutenant David Benjamin, Lamberti's executive officer, informing him that BSO was not going to rehire him because they had seen photographs of Stanley wearing a t-shirt in support of Israel. Stanley testified that during this conversation, Benjamin told him "that the sheriff stated that since [Stanley] didn't support him, he was not going to support [Stanley] in rehiring him." The decision was made final in a letter from BSO dated December 8, 2008, which rescinded Stanley's employment offer because "areas of concern arose during the selection process."

Stanley filed a formal complaint against BSO with the Public Employees Relations Commission on May 7, 2009; the hearing officer found for Stanley. That decision was later reversed by Florida's First District Court of Appeals. See Sheriff of Broward Cty. v. Stanley, 50 So. 3d 640 (Fla. Dist. Ct. App. 2010). Stanley then commenced this lawsuit in the United States District Court for the Southern District of Florida against Lamberti in his official capacity, alleging violations of his First Amendment rights pursuant to 42 U.S.C. § 1983.

Meanwhile, Israel again challenged Lamberti at the ballot box in 2012, and this time he won; he took office in January 2013. In August 2013, Stanley's complaint survived a motion to dismiss. On September 9, 2013, Stanley substituted Sheriff Israel as the defendant because Lamberti had been sued in his official capacity and was no longer Sheriff. See Fed. R. Civ. P. 25(d). Following

5

discovery, BSO's motion for summary judgment was denied.  The case then proceeded to trial; a jury was selected on January 14, 2015, and the trial was scheduled to begin the next day.  However, on January 13, 2015, this Court issued an opinion in Pellitteri v. Prine, 776 F.3d 777 (11th Cir. 2015), which held that a Georgia sheriff is an "arm of the State" for Eleventh Amendment purposes when exercising his power to hire and fire deputies.  Id. at 779.  BSO first learned about this holding on the evening of January 14, and it brought the case to the district court's attention on the morning of January 15.  The court postponed the trial and ordered additional briefing regarding the question of Eleventh Amendment immunity in light of Pellitteri.  After this briefing, BSO again moved for summary judgment.  The court granted BSO's motion on September 1, 2015, and Stanley appealed that decision.

Stanley's complaint originally included five prayers for relief: (1) a declaratory judgment that Lamberti's actions violated Stanley's First Amendment rights; (2) an injunction against Lamberti, his successors, or his coworkers from retaliating against Stanley; (3) damages against Lamberti in his official capacity; (4) costs and fees against Lamberti in his official capacity; and (5) other relief as is just.  Stanley later conceded that the third item, damages in Lamberti's official capacity, was a "typographical-error relic" from before the decision to sue

6

Lamberti in only his official capacity, and he withdrew that claim.  Thus, his remaining claims are for declaratory and injunctive relief, plus costs and fees.

## II.

"We review a district court's grant of summary judgment de novo, viewing all of the facts in the record in the light most favorable to the non-movant." Haynes v. McCalla Raymer, LLC, 793 F.3d 1246, 1249 (11th Cir. 2015) (quotations omitted).  Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  District court decisions regarding Eleventh Amendment immunity are also reviewed de novo.  See Pellitteri, 776 F.3d at 779.

## A.

The Eleventh Amendment to the Constitution protects states from being subjected to suit in federal court. The Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  The Supreme Court has extended this protection to also bar suits against a state in federal court brought by the state's own citizens.  See generally Hans v. Louisiana, 134 U.S. 1 (1890).  However, "the Eleventh Amendment does not immunize municipalities from suit."  Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs, 405 F.3d 1298, 1301 (11th Cir. 2005); see

7

also Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690 n.54 (1978) (noting the absence of "any basis for concluding that the Eleventh Amendment is a bar to municipal liability").  An officer, therefore, is entitled to Eleventh Amendment immunity if he is acting as an arm of the state but not if he is acting as an arm of the county.

The Supreme Court has clarified that in making an arm-of-the-state determination, the question is not whether the officer acts for the state or the county "in some categorical, 'all or nothing' manner."  McMillian v. Monroe Cty., Ala., 520 U.S. 781, 785 (1997).  Rather, we "ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue."  Id.  The result is a function-specific determination -- "we are not seeking to make a characterization of [ ] sheriffs that will hold true for every type of official action they engage in."  Id.

Following the Supreme Court's guidance in McMillian, this Court adopted a function-specific approach to the arm-of-the-state analysis.  See Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc) ("Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to rise.").  Manders solidified a four-factor test to be used in making such determinations: "(1) how state law defines the entity; (2) what degree of control the

8

State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Id. at 1309. These factors are evaluated in light of the specific function at issue. Id. at 1308.

We have never addressed the precise question at issue in this case, but a trio of cases -- Manders, Abusaid, and Pellitteri -- bears heavily on our decision. Because the analysis in each case is peculiarly dependent on facts and on state law, we detail these precedents at some length.

Although it addressed neither the function nor the state law at issue today, Manders is important because it established the four-factor test in light of the Supreme Court's decision in McMillian. Manders involved a determination of whether a Georgia sheriff was acting as an arm of the state in establishing a use-of-force policy at a jail and training his deputies accordingly. Manders, 338 F.3d at 1305–06. In concluding that the sheriff was an arm of the state, the Manders Court first emphasized that Georgia's sheriffs are defined as separate constitutional offices independent from their counties and that "counties delegate no power or authority to sheriffs." Id. at 1319. Specifically, "[t]he sheriff's authority to use force . . . and the sheriff's obligation to administer the jail are directly derived from the State and not delegated through the county entity." Id. Second, there was a high degree of state control because Georgia required annual specialized training of sheriffs in all counties, and we found it "reasonable to assume that such training

9

includes instruction on force policy." Id. at 1320. In contrast, the counties had "no authority, control over, or involvement in" the sheriff's force policy at the jail. Id. at 1322. Third, although the county bore "the major burden of funding [the sheriff's] office and the jail," this characteristic was not dispositive because the state had mandated that structure and because the state funded sheriffs' training programs. Id. at 1323. The fourth and final factor -- the payment of adverse judgments -- was not clearly in favor of either side. But with three of the four factors pointing decidedly toward immunity, the Court concluded that, "at a minimum, the liability-for-adverse-judgment factor [did] not defeat" the Sheriff's immunity claim. Id. at 1328.

Manders is informative but not dispositive in this case because it addressed a Georgia sheriff. Given the weight of state law in this analysis, cases involving Florida sheriffs are more instructive. See Manders, 338 F.3d at 1309 n.10 ("[S]tates have extremely wide latitude in determining their forms of government and how state functions are performed."); McMillian, 520 U.S. at 786 ("[O]ur understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law."). In Hufford v. Rodgers, 912 F.2d 1338 (11th Cir. 1990), a panel of this Court held that "the Eleventh Amendment does not protect Florida sheriffs from liability under section 1983." Id. at 1342. Cases involving Florida

10

sheriffs after Hufford have uniformly followed that decision and have entertained § 1983 suits against sheriffs in various situations. See, e.g., Hutton v. Strickland, 919 F.2d 1531, 1542 (11th Cir. 1990) (repossessing property); Ortega v. Schramm, 922 F.2d 684, 694 (11th Cir. 1991) (searching and arresting); Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (arresting and detaining suspects); Schmelz v. Monroe Cty., 954 F.2d 1540, 1543 (11th Cir. 1992) (supervising inmates); Edwards v. Okaloosa Cty., 5 F.3d 1431, 1432 (11th Cir. 1993) (supervising inmates); Gordan v. Cochran, 116 F.3d 1438, 1439 n.1 (11th Cir. 1997) (discharging administrative employees).[1]

Hufford and its pre-Manders progeny did not undertake the function-by-function analysis mandated by McMillian and Manders. This Court's lone post-Manders case addressing Florida sheriffs is Abusaid, which determined that a Florida county sheriff does not act as an arm of the state when enforcing a county ordinance. Abusaid, 405 F.3d at 1304. The Court marched through the Manders factors, starting with the state law definition: Florida's constitution labels sheriffs "county officers" and "expressly authorizes counties to abolish the office of the sheriff altogether." Id. at 1305 (citing Fla. Const. art. VIII, § 1(d)). The degree-of-

---

[1] In Gordon, former employees of the Broward County Sheriff's office brought a § 1983 action against the sheriff, alleging that they were discharged by the new sheriff because they had opposed his candidacy. Gordon, 116 F.3d at 1439. However, the analysis in that case focused on whether political loyalty was an appropriate requirement for the plaintiffs' various jobs. See id. at 1440–41. Gordon ultimately offers us little help in this case, despite its factual similarities.

11

control factor, while "arguably mixed," weighed against immunity because individual counties had "substantial discretion over how to utilize" the sheriff. Id. at 1306. In this particular case, the Sheriff was acting "pursuant to [an] express grant of authority by the County" and "acting on behalf of the County" to enforce its ordinance. Id. at 1310. The source of funds also weighed against immunity because even some residual state control left "unaltered the fundamental fact that the sheriffs' funds are derived entirely from their respective counties." Id. at 1311. Finally, the Court concluded that the adverse-judgment factor also weighed against immunity, because no state statute provided funds for payment but "counties certainly may be—and have been—held liable for a judgment against a sheriff." Id. at 1313.

Abusaid did not address the function at issue in this case -- the hiring and firing of deputies while acting in the capacity of chief correctional officer. The closest we have come to addressing that precise function is in Pellitteri. In that case, this Court determined that a Georgia sheriff acts as an arm of the state when hiring and firing his deputies. Pellitteri, 776 F.3d at 778. As for the first factor, the Court emphasized that "sheriffs in Georgia derive their power and duties from the State, are controlled by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs." Id. at 780 (quoting Manders, 338 F.3d at 1313). Specifically, "the authority of sheriffs to employ personnel is also

12

derived from the State." Id. The state maintained control over hiring and firing by regulating the certification process for peace officers, disciplining peace officers for misconduct, and giving the Governor broad investigative and suspension powers. See id. at 781. Any deputies hired would "assist [sheriffs] in executing their own duties, which have been delegated to them by the State." Id. at 782. Funding was also controlled by the state because state law required counties to set budgets for their sheriffs. See id. While the adverse-judgment factor "weigh[ed] in favor of denying immunity," it was outweighed by the first three factors and immunity was proper. Id. at 783.

### B.

With these cases in mind, we apply the Manders analysis to a Florida sheriff acting in his capacity as Chief Correctional Officer (CCO) in the hiring and firing of deputies. Because the overall weight of the factors tips on the side of county status, we conclude that a Florida sheriff acting in this capacity is not entitled to Eleventh Amendment immunity.

### 1.

Again, the first factor -- how state law defines the entity -- weighs toward county status. Notably, state law defines sheriffs as county officers, and it gives counties the discretion to choose their CCOs. These characteristics are indicative of county status, and the district court's opposite conclusion was due in part to its

13

reliance on Pellitteri.  The Florida constitution names the sheriff as one of several "county officers," and provides that a county is free to abolish any county office, including the sheriff's office, as long as those duties are assigned to another officer. See Fla. Const. art. VIII, § 1(d).  As we have previously concluded, this definition "weighs heavily against assigning arm of the state status to a Florida sheriff." Abusaid, 405 F.3d at 1305.

State law creates the position of CCO and requires county commissioners to "designate a chief correctional officer and such correctional officers as they deem necessary."  Fla. Stat. § 951.06(1).  The Florida constitution does not define "chief correctional officer."  "Correctional officer" is statutorily defined as "any person who is appointed or employed full time by the state or any political subdivision thereof, . . . whose primary responsibility is the supervision, protection, care, custody, and control, or investigation, of inmates within a correctional institution." Id. at § 943.10(2).  The CCO's responsibilities are statutorily defined: he "shall see that all rules and regulations prescribed by law or the department are fully observed and complied with; enforce discipline among the prisoners in and about the camps; and administer punishment to prisoners."  Id. at § 951.06(2). Importantly, a county may, but need not, choose to designate its sheriff as its CCO in satisfaction of § 951.06, so long as it selects someone for that position.  See id. at § 951.061(1).  This was not the case until § 951.061 was enacted in 1986; before

then, Florida sheriffs had "no inherent or constitutional duty to maintain a county jail." Feldman v. Brescher, 561 So. 2d 1271, 1272–73 & n.3 (Fla. Dist. Ct. App. 1990).  Thus, the county may designate its sheriff the CCO if he is to have those responsibilities at all.

Broward County has enacted an ordinance designating the Broward County Sheriff as the CCO of the Broward County Correctional System. See Broward Cty. Ord. § 18-01(a).  That County ordinance instructs the Sheriff, as CCO, to (1) "appoint such officers as he deems necessary . . . to perform the duties of chief correctional officer"; (2) "enforce all existing state laws, administrative rules of the Florida Department of Corrections, and rules of the Broward County Administrative Code, concerning the operation and maintenance of county jails"; and (3) "include salaries for county correctional officers in his proposed budget of expenditures." Id. at § 18-01(b).  The Broward County Administrative Code specifies that "[t]he Sheriff, as the Chief Correctional Officer, is solely responsible for the operation of the existing correctional System." Broward Cty. Admin. Code § 18.40(a).  The Sheriff exercises this responsibility solely because Broward County designated him as its CCO.

The district court construed the county's ability to choose its CCO as a characteristic favoring immunity because the state created the CCO position and charged the CCO with enforcing state laws.  This conclusion was based on its

15

reading of <u>Pellitteri</u>. But we think there are two powerful differences between Florida's and Georgia's laws.  First, the Florida constitution leaves with the county the choice of whether to have a sheriff's office at all, while the Georgia constitution does not.  <u>Compare</u> Fla. Const. art. VIII, § 1(d) ("[A]ny county office may be abolished when all the duties of the office prescribed by general law are transferred to another office."), <u>with</u> Ga. Const. art. IX, § 1, ¶ III (providing for the election, terms, and salaries of county officers but not discussing the ability to abolish the sheriff's office).  Second, Georgia does not have a separate position equivalent to CCO.  While Georgia statutes occasionally refer to the "chief law enforcement officer" of a county, that term is nowhere defined in state law. Georgia sheriffs are, "[b]y virtue of their offices," the jailers of their counties and have the authority to appoint other jailers.  Ga. Code Ann. § 42-4-1(a).  In sharp contrast, Florida creates a separate position of CCO that is responsible for overseeing county jails.  <u>See</u> Fla. Stat. § 951.06.  Florida then gives to the county the additional choice whether to assign that position to a person who functions solely as the CCO, to the sheriff pursuant to § 951.061, or even to a private entity under § 951.062.  Only if the county designates the sheriff as CCO is he tasked with the responsibility of running the county's correctional facilities.  Thus, Florida's laws (unlike Georgia's) define the CCO role in a way that affords great

discretion to the counties, and this weighs heavily against Eleventh Amendment immunity.

2.

The second <u>Manders</u> factor -- degree of state control -- presents a closer call. While sheriffs may appoint deputies free from state or county interference, the state sets minimum hiring qualifications that deputies must satisfy. This is a strong indicia of state control, and our recent opinion in <u>Pellitteri</u> addressed a similar situation in Georgia and reached the same conclusion. In this case, however, we find this power counterbalanced by a county's unilateral ability to designate its CCO and by a county's involvement in the removal of deputies.

Of importance in this case is the sheriff's capacity as CCO. The state exerts some control over the various capacities in which a sheriff acts by codifying a set of responsibilities in Fla. Stat. § 30.15. But, as we noted in <u>Abusaid</u>, "this list does not alter the ability of a county to assign its sheriff whatever additional duties it sees fit"; and "many of the functions assigned to the sheriff are carried out either at the sole discretion of the county or on behalf of the county." <u>Abusaid</u>, 405 F.3d at 1309–10. And as we have noted, Florida sheriffs receive those responsibilities <u>only</u> if the county makes the designation; control over that critical decision is vested solely in the county.

An examination of control over the hiring and firing of the CCO's deputies is more mixed.  Florida's sheriffs have the power to appoint deputies as they wish.  See Fla. Stat. § 30.07.  The sheriffs' decisions in this regard are protected from state or county interference by statute: "The independence of the sheriffs shall be preserved concerning the purchase of supplies and equipment, selection of personnel, and [ ] hiring, firing, and setting of salaries of such personnel."  Id. at § 30.53.  This independence extends to sheriffs acting in their capacity as CCO, because state law allows a sheriff as CCO to "appoint such officers as he or she deems necessary."  Id. at § 951.061(1).  A sheriff acting as CCO can thus appoint deputies without state or county interference.

State law gives the Governor some control over removal of the sheriff: he may suspend county officers "for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony."  Fla. Const. art. IV, § 7(a).  However, the state has little involvement in the removal of deputies, be they deputy sheriffs or deputy correctional officers.  The state allows sheriffs to remove deputies with written notice, see Fla. Stat. § 30.073(3), and state law lists one instance in which the county must remove a misbehaving correctional officer.  See id. at § 951.06(3) ("All boards of county commissioners shall immediately discharge any correctional officer who shall be guilty of gross negligence or cruel and inhuman

18

treatment of prisoners under their control."). These provisions leave the counties free to implement additional removal procedures, as Broward County has done. In fact, Broward County's removal ordinance is more detailed than the state statutes: it allows the county sheriff to remove full-time deputy sheriffs of rank lieutenant and below for cause after notice and a hearing, while other employees are removable at will. See Broward Cty. Ord. § 18-6(b)(2), (d)(2)–(3). Although a county's removal decisions have to be reported to the state, see Fla. Stat. § 943.139(2), merely reporting such decisions does not automatically impose state control over the decision.

The strongest indicia of state control over personnel decisions is found in state law that requires sheriffs and their deputies to meet certain statutory qualifications and baseline requirements before they may be hired. See id. at §§ 30.073, 943.13. Florida created the Criminal Justice Standards and Training Commission (CJSTC) to monitor compliance with those standards and to govern the training and certification of correctional officers. See id. at §§ 943.11, 943.12.[2] Counties have no control over the CJSTC's actions, but they are free to impose additional or more-stringent requirements on top of the statutory minimums. See

---

[2] The CJSTC has nineteen members, including three state officers (Secretary of Corrections, Attorney General, and Director of the Division of Florida Highway Patrol) and sixteen members appointed by the Governor. Fla. Stat. § 943.11(1)(a). Each of the sixteen members appointed by the Governor is "accountable to the Governor for the proper performance of the duties of his or her office" and is removable by the Governor for "malfeasance, misfeasance, neglect of duty, incompetence, or permanent inability to perform official duties," or for pleading guilty to or being found guilty of a felony. Id. at § 943.11(1)(d).

id. at § 943.137(1). If a county sets higher standards, the CJSTC will recognize and uphold those standards. See id. at § 943.137(2).

In Pellitteri, a structure like the one Florida has devised with the CJSTC was treated as a strong indication of state control. The Georgia legislature created a similar committee -- the Peace Officer Standards and Training Council -- and set similar minimum qualifications. See Ga. Code Ann. §§ 35-8-3, 35-8-7.1. The Pellitteri panel concluded that "[t]hese threshold requirements for serving as a peace officer in Georgia significantly limit a sheriff's discretion when hiring potential deputies." Pellitteri, 776 F.3d at 781. We agree that the state exerts greater power than the county in this regard.

While this factor is close, we conclude that it ultimately weighs toward county status and against immunity. Of primary importance is the fact that in Florida, the county controls whether the sheriff will act as CCO at all or whether those responsibilities will be assigned elsewhere. This characteristic, along with a county's ability to regulate the removal of deputies, sufficiently counterbalances the state-controlled nature of the CJSTC.

3.

The third factor -- the source of funding -- also points toward county status. The fact that a sheriff's budget is funded entirely by the county, even when he acts

20

as CCO, is a strong indicator of county control that is not outweighed by the fact that the state maintains some control over the budget review process.

While state law sets sheriffs' salaries and requires that sheriffs' budgets include their deputies' salaries, see Fla. Stat. §§ 30.49(4), 145.071, this Court has previously found "nothing in Florida law to suggest that the state contributes any money at all to its sheriffs." Abusaid, 405 F.3d at 1310. The sheriff is "financially accountable to his county and only to his county, since he must pay any money his office earns into the county treasury." Id. at 1312. The sheriff's budget must be approved by the county, and the salaries of correctional officers are funded from the general revenue of the county. See Fla. Stat. §§ 30.49, 951.06(5); Broward Cty. Ord. § 18-01(c). And while the sheriff's salary is set by state legislature, correctional officers' salaries are fixed by the board of county commissioners. Compare Fla. Stat. § 145.071, with id. at § 951.06(4).

Even more telling is the fact that the decision to designate the sheriff as CCO rests solely within the county's discretion. If the county does not want to provide its sheriff with extra funds to fulfill the obligations of CCO, it can choose to designate a private entity as its CCO. See id. at § 951.062(1). That entity would enter into a contract with the county for the operation and maintenance of county jails, the terms of which would be determined by contract between the county and the entity without state involvement. See id. at § 951.062(1)–(2). Perhaps

21

recognizing that sheriffs are good candidates for CCO, the state legislature has merely simplified the budget process for sheriffs who are so designated and has allowed them to submit one budget instead of two.

The state does, however, retain some control over how a sheriff spends its funds, but that is not enough to tip the scale. State law requires sheriffs who are also CCOs to include their deputies' salaries in their county budgets, see id. at § 951.061(3), but, again, county revenue is the actual source of the funding. More salient is the state's involvement in the budget review process. The sheriff is required to submit a proposed budget to the board of county commissioners each year, id. at § 30.49(1), and the commissioners "may amend, modify, increase, or reduce any or all items" in the proposed budget and must approve the final budget. Id. at § 30.49(4). But if the sheriff disagrees with the commissioners' actions, he may appeal to the Administration Commission -- composed of the Governor and the members of his Cabinet, id. at § 14.202 -- by filing a petition with the Executive Office of the Governor. Id. at § 30.49(4)(a). The Administration Commission's decision is final, and the county may not alter it except on request of the sheriff. Id. at § 30.49(5), (8).

The Pellitteri panel relied on this review process in concluding that the funding factor is indicative of arm-of-the-state status. The district court agreed with that conclusion, in part because it understood Pellitteri as shifting the third-

22

prong analysis from the source of funds to the degree of control the state maintains over how the entity spends its funds. See Pellitteri, 776 F.3d at 782 ("[A]lthough each county sets the total budget for the sheriff's office, it cannot dictate how the sheriff spends those funds."). In Abusaid, however, we suggested that control over budgeting is more properly considered under the second prong. See Abusaid, 405 F.3d at 1311. But "even if state control over the budgeting process were the proper inquiry, this third factor would still weigh against arm of the state status" for Florida sheriffs. Id. at 1312. This conclusion is even stronger, we think, for a sheriff acting as CCO, because the county determines whether the sheriff will act in that capacity at all and sets correctional officers' salaries. The third factor thus weighs against arm-of-the-state status.

4.

The final factor -- responsibility for adverse judgments -- also weighs against immunity, as BSO conceded in its motion for summary judgment on the Eleventh Amendment question. D.E. 145 at 6 ("The Broward Sheriff concedes that as in Pellitteri, the fourth Manders factor . . . does not weigh in favor of BSO's argument of Eleventh Amendment immunity."). This point was again conceded on appeal. Appellee's Brief at 25 ("BSO concedes that the fourth Manders factor . . . does not weigh in favor of arm of the State status."). It is enough for us to note that "no provision of Florida law provides state funds to a Florida sheriff to satisfy

23

a judgment against the sheriff," Hufford, 912 F.2d at 1342, and that "neither the State nor the County will be required to directly pay for any adverse judgment against the Sheriff's office." Pellitteri, 776 F.3d at 783; see also id. ("[T]o the extent that the state treasury will be spared here from paying any adverse judgment, this factor weighs in favor of denying immunity."). But because the issue is not contested here, the fourth factor can summarily be taken in favor of county rather than state status.

While the issue of state or county control is a close question, and we commend the district court for the care with which it undertook this analysis, we conclude that the four Manders factors taken in concert ultimately indicate that a Florida sheriff is not an arm of the state when he is acting in his capacity of CCO in the hiring and firing of his deputies.

## IV.

Stanley's second claim is that even if BSO is an arm of the state, he was still entitled to declaratory and injunctive relief. However, in entering final judgment for BSO, the district court did not address equitable relief. We, therefore, decline to rule on that claim and instead remand the matter in the first instance to the district court for a decision.[3]

---

[3] The district court may also consider whether Stanley's claims for declaratory and injunctive relief are moot, since it is unclear on this record whether Stanley has requested reinstatement or reapplied for his position.

24

State law impacts many aspects of a sheriff's actions taken in his capacity of CCO, including personnel decisions.  But the designation of the sheriff as the CCO is a decision that rests solely with the county.  Broward County has made that designation, and its sheriff performs his duties in this function because of the county's action.  In light of our review of the <u>Manders</u> factors, the district court's grant of summary judgment in favor of BSO is REVERSED and the case REMANDED to the district court.

REVERSED and REMANDED.