[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11231
_____

D.C. Docket No. 8:13-cv-02873-JDW-TBM

DORIS FREYRE,

Plaintiff-Appellee,
Cross-Appellant,

versus

CHAD CHRONISTER,
in his official capacity as Sheriff of the Hillsborough
County Sheriff's Office,

Defendant-Appellant,
Cross-Appellee,

HILLSBOROUGH COUNTY SHERIFF'S OFFICE,
IRIS C. VALDEZ,
JESSICA PIETRZAK,

Defendants-Appellees,

UNITED STATES OF AMERICA,

Intervenor.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(December 14, 2018)

Before TJOFLAT, MARCUS and NEWSOM, Circuit Judges.

TJOFLAT, Circuit Judge:

This interlocutory appeal asks us to determine whether the Hillsborough County Sheriff's Office ("HCSO"), in conducting child-protective investigations under a grant agreement with the Florida Department of Children and Families ("DCF"), acts as an arm of the state entitled to Eleventh Amendment immunity. The District Court held that HCSO was not an arm of the state and, for the reasons explained below, we affirm.

I.

In 1998, the Florida Legislature required DCF to transfer all responsibility for child-protective investigations in certain counties to the county sheriff. Fla. Stat. § 39.3065(1). As to the remaining counties, including Hillsborough County, the Legislature gave DCF the option to transfer DCF's responsibility for child-protective investigations to the county sheriff under grant agreements. *Id.* § 39.3065(3)(a). The Legislature specified certain minimum requirements that grantee sheriff's offices must meet: for example, sheriffs must "operate, at a minimum, in accordance with the performance standards and outcome measures established by the Legislature for protective investigations conducted by the Department of Children and Families." *Id.* § 39.3065(3)(b). The Legislature also specified other requirements for these grant agreements pertaining to appropriation

2

and segregation of funds, reporting, and program evaluation. *Id.* §§ 39.3065(3)(b)-(d).

On July 1, 2006, HCSO assumed responsibility for child-protective investigation in Hillsborough County accepted by DCF's Abuse Hotline. HCSO conducts these investigations pursuant to a grant agreement ("Grant Agreement"), the details of which we explain, where relevant, below.

On March 16, 2011, DCF received a call on its Abuse Hotline alleging that Doris Freyre had neglected her disabled child, MAF. HCSO, through child-protective investigators Jessica Pietrzak and Iris Valdez and under Sheriff David Gee's supervision, conducted an investigation that ended in the removal of MAF from Freyre's care. At a shelter hearing in state court, the judge agreed with HCSO that there was probable cause to remove MAF from Freyre's care but asked whether, instead of permanent removal, 24-hour home health care services could be obtained. The state was unable to secure those services, and MAF was temporarily hospitalized at Tampa General Hospital.

Unable to find a local, long-term placement that would meet MAF's needs, HCSO then sought to transfer MAF from Tampa General Hospital to a skilled nursing facility in Miami. Freyre was informed of the transfer and refused to consent. Freyre maintains that her father filed and served the state Attorney General's Office with a *pro se* petition on her behalf requesting an emergency

3

hearing in state court. The document was filed with the court, but Freyre was unable to prove that the state office was served, and HSCO contends that none of its personnel saw this petition. In any event, MAF was transported to the nursing facility in Miami without a hearing, and died shortly thereafter.

In November 2013, Freyre brought this action against HCSO, the State of Florida, Sheriff David Gee, Jessica Pietrzak, Iris Valdez, and other individuals and entities associated with MAF's removal and transfer. In her complaint, she asserted claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and 42 U.S.C. § 1983 for infringement of her rights under the Fourteenth Amendment. A number of these defendants settled out, and in March 2017 the District Court granted Pietrzak's and Valdez's motions for summary judgment as well as HCSO's motion for summary judgment with respect to all of Freyre's claims except her associational ADA claim. The District Court denied HCSO Eleventh Amendment immunity, and HCSO lodged this interlocutory appeal two days later. Freyre then cross appealed the District Court's grant of summary judgment on her individual ADA, Rehabilitation Act, and § 1983 claims.

II.

As an initial matter, we must determine which issues in this case we have jurisdiction over. Sheriff Chronister[1] raises two issues on interlocutory appeal: (1) whether the District Court erred in concluding that HCSO was not entitled to Eleventh Amendment immunity; and (2) whether the District Court erred in denying HCSO summary judgment on Freyre's associational ADA claim. In addition, Freyre as cross-appellant raises two issues: (1) whether the District Court erred in granting Valdez-Corey's and Pietrzak's motions for summary judgment; and (2) whether the District Court erred in granting HCSO's motion for summary judgment on Freyre's individual ADA, Rehabilitation Act, and § 1983 claims. Although we unquestionably have jurisdiction under the collateral order doctrine to review the question of Eleventh Amendment immunity, we decline to exercise pendent appellate jurisdiction over the parties' remaining issues.

A.

Generally speaking, our Court may only hear appeals from a district court's final order. 28 U.S.C. § 1291. "A final order is one that ends the litigation on the merits and leaves nothing for the court to do but execute its judgment." *World Fuel Corp. v. Geithner*, 568 F.3d 1345, 1348 (11th Cir. 2009) (quoting *Crawford*

---

[1] Freyre filed this civil action against Sheriff David Gee in his official capacity as Sheriff of the Hillsborough County Sheriff's Office. Chad Chronister, Gee's successor, was later substituted as the named defendant for Freyre's official-capacity claim.

5

*& Co. v. Apfel*, 235 F.3d 1298, 1302 (11th Cir. 2000)).  An order that disposes of fewer than all the claims of all the parties is not final and appealable unless the district court certifies the order for immediate review under Federal Rule of Civil Procedure 54(b).  *Supreme Fuels Trading FZE v. Sargeant*, 689 F.3d 1244, 1245–46 (11th Cir. 2012) (per curiam).  Similarly, an order that contemplates further substantive proceedings in a case is not final and appealable.  *Broussard v. Lippman*, 643 F.2d 1131, 1133 (5th Cir. 1981).[2]  We refer to this as the final judgment rule.

Like many legal rules, the final judgment rule is subject to exceptions.  One such exception is the collateral order doctrine articulated by the Supreme Court in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S. Ct. 1221 (1949).  Under *Cohen*, an otherwise nonappealable interlocutory order is appealable if it (1) "conclusively determine[s] [a] disputed question," (2) "resolve[s] an important issue completely separate from the merits of the action," and (3) "[is] effectively unreviewable on appeal from a final judgment."  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S. Ct. 2454, 2458 (1978); *see also Plaintiff A v. Schair*, 744 F.3d 1247, 1252–54 (11th Cir. 2014) (explaining *Cohen*'s three-part test).  Both the Supreme Court and this Circuit have held that an order denying a defendant

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions rendered before close of business on September 30, 1981.

6

Eleventh Amendment immunity is a collateral order subject to immediate interlocutory appeal. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147, 113 S. Ct. 684, 689 (1993); *Black v. Wigington*, 811 F.3d 1259, 1270 (11th Cir. 2016); *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999). Accordingly, the District Court's denial of Eleventh Amendment immunity is properly before this Court.

But the same cannot be said of the other issues raised by the parties. For example, Sheriff Chronister argues that Freyre lacks standing to pursue her associational ADA claim because she "failed to show that she personally suffered exclusion, denial of benefits, or discrimination because of her association with MAF." Appellant's Br. at 31 (emphasis omitted). Even if he's right, that issue is unreviewable: in *Summit Medical Associates*, we held that "the question of standing does not fit within the collateral order doctrine." 180 F.3d at 1334. And it isn't difficult to see why: "[a]lthough a district court's standing determination conclusively resolves a disputed question and settles an important issue separate from the merits of the case, courts have recognized that the issue of standing is not effectively unreviewable on appeal from a final judgment." *Id*. In other words, standing satisfies the first two prongs of the *Cohen* test but fails the third.[3]

---

[3] Because Sheriff Chronister's challenge to Freyre's associational ADA standing is unreviewable under the collateral order doctrine, his challenge to her associational ADA claim on the merits is unreviewable *a fortiori*.

7

What's true of standing is even truer of Freyre's claims as cross-appellant. The District Court's summary judgment order in favor of Valdez-Corey and Pietrzak "conclusively determine[d] [a] disputed question,"[4] but it was not "an important issue completely separate from the merits"[5]—indeed, it *was* the merits. And the District Court's grant of summary judgment is reviewable once all the claims in the case—including the claim pending against Sheriff Chronister—reach a final decision. *See Myers v. Sullivan*, 916 F.2d 659, 673 (11th Cir. 1990) ("[E]arlier interlocutory orders merge into the final judgment, and a party may appeal the latter to assert error in the earlier interlocutory order."). This reasoning likewise extends to Freyre's individual ADA, Rehabilitation Act, and § 1983 claims, and precludes us from exercising jurisdiction over them under the collateral order doctrine.

But that's not all there is to say about jurisdiction, for even if an interlocutory order is not appealable under the collateral order doctrine, we may exercise jurisdiction under the pendent appellate jurisdiction doctrine. Under this doctrine, we may address a nonappealable decision when it is "'inextricably intertwined' with the appealable decision or when 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" *King v. Cessna Aircraft*

---

[4] *Livesay*, 437 U.S. at 468, 98 S. Ct. at 2458.

[5] *Id.*

*Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009) (per curiam) (alteration in original) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51, 115 S. Ct. 1203, 1212 (1995)).  Although the question of whether to exercise pendent appellate jurisdiction is discretionary, *Summit Med. Assocs.*, 180 F.3d at 1335, we do so "only under rare circumstances," *King*, 562 F.3d at 1379.  In this specific context, we have repeatedly stated that where we can resolve the issue of Eleventh Amendment immunity without reaching the merits of a substantive claim, we will not exercise pendent appellate jurisdiction over the substantive claim.  *See, e.g.*, *Black*, 811 F.3d at 1270–71; *Summit Med. Assocs.*, 180 F.3d at 1335–36.

In *Summit Medical Associates*, we considered on interlocutory appeal whether to review standing under our pendent appellate jurisdiction when appellants had properly appealed, under the collateral order doctrine, the District Court's rejection of their Eleventh Amendment immunity defense.  180 F.3d at 1334–35.  We ultimately declined to exercise jurisdiction because the two questions were not inextricably intertwined—the question of immunity could be resolved without reaching the merits of the standing challenge.  *Id.* at 1335–36.  Our reasoning there provides the same result here: the purely legal question of whether the District Court was correct to deny HCSO Eleventh Amendment immunity has nothing to do with whether Freyre has demonstrated standing to

9

pursue her associational ADA claim.[6]  *See Black*, 811 F.3d at 1270–71.  Sheriff

Chronister's argument to the contrary—that the questions are inextricably

intertwined because denying Freyre standing would conclusively resolve this

case[7]—misses the mark.  The question is not whether deciding the pendent issue

would moot the properly appealed issue, but whether "review of the former

decision [is] necessary to ensure meaningful review of the latter."  *King*, 562 F.3d

at 1379 (alteration in original) (quoting *Swint*, 514 U.S. at 51, 115 S. Ct. at 1212).

And that simply is not the case here.

　　We should say one final thing about pendent appellate jurisdiction.  At oral

argument, we suggested that Freyre's claims as cross-appellant would be

reviewable under our pendent appellate jurisdiction if, but only if, we reached the

question of abrogation.[8]  We write now to clarify that these issues—*i.e.*, the

question of immunity and the merits issues raised by both parties on appeal—

would not be inextricably intertwined even if we were to reach the question of

abrogation.  "When a plaintiff argues that Congress has abrogated sovereign

immunity for a particular type of claim, we review that argument *de novo*."  *Black*,

---

[6] This also applies to Sheriff Chronister's merits challenge to the associational ADA claim as well as all of Freyre's claims as cross-appellant. All of these issues are separate, legally and factually, from the legal question of whether HCSO is entitled to Eleventh Amendment immunity.

[7] Appellant's Br. at 2.

[8] Oral Argument at 19:35–24:52, *Freyre v. Chronister*, ___ F.3d ___ (2018) (No. 17-11231), goo.gl/pzwMpJ.

811 F.3d at 1270.  If we agree, then "a plaintiff who *alleges* that type of claim . . . successfully invoke[s] our jurisdiction unless [the] allegations are 'immaterial and made solely for purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'"  *Id.* (emphasis added) (quoting *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1352 (11th Cir. 1998)).  Here, Sheriff Chronister does not argue that Freyre's associational ADA claim is "immaterial" or "insubstantial and frivolous"; his argument is that she did not adduce enough evidence at summary judgment to proceed with the claim.  Appellant's Br. at 44–49.  But all we need to proceed to the abrogation question is a legitimate allegation of a claim for which Congress has abrogated sovereign immunity.  *See Black*, 811 F.3d at 1270.  Accordingly, whether the District Court erred by denying summary judgment on the associational ADA claim—as Sheriff Chronister argues—or erred by granting summary judgment on all the other claims—as Freyre argues—is not a question "inextricably intertwined" with sovereign immunity or abrogation.

### B.

Having defined the scope of this appeal, we next consider whether HSCO is entitled to Eleventh Amendment immunity when performing child-protective investigations.  We review this question *de novo*.  *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1313 (11th Cir. 2011).  Because HCSO asserted Eleventh Amendment immunity in a motion for summary

judgment, it should prevail if there is "no genuine dispute as to any material fact" and it is entitled to immunity "as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to Freyre and draw all reasonable inferences in her favor. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015).

The Eleventh Amendment protects states from being subject to suit in federal court. It provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has extended this protection to bar suits against a state in federal court brought by the state's own citizens. *Hans v. Louisiana*, 134 U.S. 1, 15–16, 10 S. Ct. 504, 507–08 (1890). But "the Eleventh Amendment does not immunize municipalities from suit." *Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1301 (11th Cir. 2005). "An officer, therefore, is entitled to Eleventh Amendment immunity if he is acting as an arm of the state but not if he is acting as an arm of the county." *Stanley v. Israel*, 843 F.3d 920, 924 (11th Cir. 2016).

This Court uses a four-factor test to determine whether an entity is an arm of the state and thus entitled to sovereign immunity. These factors, articulated in *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc), are "(1) how state law

12

defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id.* at 1309. Analysis under *Manders* is function specific; in addition to determining the defendant's general status under state law, we also ask whether the defendant was acting as an arm of the state "in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Id.* at 1308; *see also Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000) ("The pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context."). Thus, our question is not simply whether HCSO acts as an arm of the state generally, but whether it does so when performing child-protective investigations under the Grant Agreement with DCF.

1.

The first *Manders* factor asks us to determine how state law defines the defendant entity. Two bodies of state law are relevant here: state law concerning the status of the entity generally, and state law concerning the specific function the entity performs in the instant case. *See Stanley*, 843 F.3d at 926–27; *Abusaid*, 405 F.3d at 1305–06.

As to the former, we have repeatedly acknowledged that Florida sheriffs are, by default, county officers. *Stanley*, 843 F.3d at 926–927; *Abusaid*, 405 F.3d at

13

1305–06; *Hufford v. Rodgers* 912 F.2d 1338, 1341 (11th Cir. 1990).  This is based on several aspects of Florida law, including: (1) the Florida Constitution's definition of sheriffs as "county officers," Fla. Const. art. VIII, § 1(d); (2) the fact that Florida sheriffs are generally elected by electors of each county, *id.*; (3) Florida counties' prerogative to abolish the office of sheriff altogether, *id.* (amended 2018);[9] and (4) Florida courts' recognition of sheriffs as county officers, *see, e.g.*, *Beard v. Hambrick*, 396 So. 2d 708, 711 (Fla. 1981) ("[A] sheriff is a 'county official,' and, as such, is an integral part of the 'county' . . . .").  "[T]his definition," we have explained, "weighs heavily against assigning arm of the state status to a Florida sheriff."  *Stanley*, 843 F.3d at 926 (quoting *Abusaid*, 405 F.3d at 1305).

Notwithstanding a Florida sheriff's presumptive status as a county officer, we have also held out the possibility that "[w]hen carrying out some . . . functions, the sheriff may well be acting as an arm of the state." *Abusaid*, 405 F.3d at 1310. In contrast to *Abusaid*—where the sheriff was enforcing a *county* ordinance—here

---

[9] At the time of the complained-of conduct, the Florida Constitution provided that "any county office may be abolished when all the duties of the office prescribed by general law are transferred to another office."  Fla. Const. art. VIII, § 1(d) (amended 2018).  But on November 6, 2018, Florida voters approved Amendment 10, which removed this language from the Florida Constitution.  After amendment, this section provides that "a county charter *may not* abolish the office of the sheriff . . . [or] transfer the duties of [the sheriff] to another officer or office."  Fla. Const. art. VIII, § 1(d) (emphasis added).

HCSO is carrying out state policy.  Specifically, HCSO contracted to perform child-protective investigations for DCF, a state agency entitled to sovereign immunity.  *See* Fla. Stat. § 20.19.  This relationship is governed by the Grant Agreement.  When HCSO sheltered and transferred MAF, it was acting pursuant to this Grant Agreement.  Thus, the question we must answer is whether, under state law, the relationship created by the Grant Agreement between DCF and HCSO weighs in favor of classifying the latter as an arm of the state.

The Grant Agreement states that "[t]he Grantee [HCSO] shall act in the capacity of an independent contractor while performing child protective services." As we explained in *Rosario v. American Corrective Counseling Services, Inc.*, 506 F.3d 1039 (11th Cir. 2007), the label "independent contractor" is legally significant.  *Id.* at 1044–45.  Florida statutes draw a distinction between "independent contractors," who are often solely liable for their actions, and "agents," to whom the state extends sovereign immunity.[10]  Florida case law states the point even more clearly.  In *Dorse v. Armstrong World Industries, Inc.*, the Supreme Court of Florida explained that "an entity or business acting as an

---

[10] *Compare, e.g.*, Fla. Stat. § 30.24(2)(b) ("independent contractors" transporting prisoners "shall be solely liable for the prisoner while the prisoner is in the custody of the company"), *id.* § 394.462(1)(c) ("independent contractor" transporting patients "is solely liable for the safe and dignified transport of the patient"), *and id.* § 916.107(10)(c) ("independent contractor" transporting clients is "solely liable for the safe and dignified transportation of the client"), *with id.* § 766.1115(2) ("It is the intent of the Legislature to ensure that health care professionals who contract to provide such services as *agents of the state* are provided sovereign immunity." (emphasis added)).

15

*independent contractor* of the government, and not as a true *agent*, logically cannot share in the full panorama of the government's immunity."  513 So. 2d 1265, 1268 (Fla. 1987) (footnote omitted) (citation omitted) (emphases added); *see also Sierra v. Associated Marine Insts., Inc.*, 850 So. 2d 582, 590 (Fla. Dist. Ct. App. 2003) ("[Defendants'] entitlement, if any, to sovereign immunity protection turns on whether they can be deemed agents of the state under either common law or statute.").

While the label of "independent contractor" serves as persuasive evidence that HCSO did not act as an agent of the state under Florida law, it is not dispositive.  *See Stoll v. Noel*, 694 So. 2d 701, 703 (Fla. 1997) (explaining "that the roles of agent and independent contractor are not mutually exclusive" and depend on "the degree of control retained or exercised by [the state]").  In addition to the label, however, the Grant Agreement explains that "the Grantee [HCSO] shall be considered by the Grantor [DCF] as agent of the Grantor *for the sole and limited purpose* of receiving information obtained from or concerning applicants and recipients of public assistance programs."  (emphasis added).  As if it were concerned that labeling HCSO an independent contractor wouldn't be enough, the Grant Agreement goes out of its way to circumscribe the function in which HCSO serves as an agent of DCF.  And notably, the function at issue in this case—child-

16

protective investigations—does not fall into this narrow exception to HCSO's general status as an independent contractor.[11]

As Sheriff Chronister points out, the Grant Agreement states that HCSO "may, during the performance of this grant, assert any privileges and immunities which are available as a result of the Grantee performing the state functions required by Chapter 39, F.S., and this Grant Agreement."  Sheriff Chronister attaches much significance to this language.  Appellant's Br. at 54.  But in our estimation, this language simply leaves intact whatever "privileges and immunities" HCSO might have as a result of performing under the Grant Agreement.  Whether there are any such privileges or immunities in the first place is a question we, interpreting the Grant Agreement under Florida law and the law of our Circuit, must decide.

All in all, we conclude that this first factor weighs against arm-of-the-state status.

2.

The second factor requires us to look at the degree of control the state exercises over the entity generally as well as with respect to the specific function at issue.  As we noted in *Abusaid*, the constitutional default rule is that Florida

---

[11] The Grant Agreement casts further doubt on HCSO's status as an agent by providing that "[t]he Grantee shall not represent to others that it has the authority to bind the Grantor unless specifically authorized in writing to do so."

sheriffs are elected by county voters.  405 F.3d 1306.  And, at the time of the events that gave rise to this litigation, counties were free to change that procedure or abolish the office of sheriff altogether.  *See supra* note 9.  The sheriff must also keep his office in the county seat and reside within two miles thereof, "illustrating the essentially local nature of the office."  *Id.* at 1306–07.  Unlike, *e.g.*, the South Florida Water Management District, which is governed by a board appointed and removable by the Governor,[12] the office of the sheriff is fundamentally a county entity.

Shifting to the function here, the Grant Agreement requires HCSO to meet state-prescribed standards when conducting child-protective investigations.  As Sheriff Chronister notes, this Court in *Stanley* described state-set minimum hiring qualifications as "strong indicia of state control."  843 F.3d at 928.  But our precedent also acknowledges that "[e]stablishing minimum requirements is not sufficient to demonstrate [state] control."  *Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 773 (11th Cir. 2014).

Although the presence of state-prescribed standards is significant, we find here—as we did in *Stanley*, 843 F.3d at 928–29—that these "strong indicia of state control" do not outweigh the indicia of local control.  Specifically, the Grant

---

[12] *See United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 603 (11th Cir. 2014).

18

Agreement provides HCSO significant autonomy in conducting child-protective investigations. In addition to designating HCSO as an independent contractor, the Grant Agreement allows HCSO to develop its own policies and procedures for child-protective investigations. The Grant Agreement also gives HCSO control over child-protective investigators and supervisors, and it leaves it to HCSO to develop hiring criteria for these positions. The Grant Agreement even gives HCSO the ability to subcontract investigations related to neglect reports and assigns HCSO "full responsibility" for safety decisions made by subcontractors.

Despite this, Sheriff Chronister argues that the Grant Agreement "is saturated with instances where DCF and the state maintain substantial control over [HCSO]." Appellant's Br. at 55. In particular, Sheriff Chronister refers to (1) HCSO's obligation to submit financial records for audit by DCF; (2) HCSO's duty to immediately notify DCF of any deaths, serious injuries, or significant accidents during child-protective investigations; and (3) performance evaluations DCF conducts of HCSO's child-protective investigations. *Id.* While these aspects of the Grant Agreement certainly impose requirements on HCSO, they're primarily reporting requirements—they don't speak directly to the "degree of control" the state exerts on HCSO in performing child-protective investigations. *Compare Shands*, 208 F.3d at 1311 (granting arm-of-the-state status to private program administrator over whom "Florida retains virtually complete control"), *with*

19

*Rosario*, 506 F.3d at 1042, 1047 (denying arm-of-the-state status to an independent contractor in part because Florida had "no supervision of [its] day-to-day activities" beyond approving letters to prospective program participants).

Sheriff Chronister also argues that HCSO wears a "state hat" when it performs child-protective investigations because the authority to do so derives from Florida statutes. Appellant's Br. at 54. It is true that we have described as a "key question" of the *Manders* analysis the question of "*for whom* sheriffs exercise [a given] power." *Abusaid*, 405 F.3d at 1310 (quoting *Manders*, 338 F.3d at 1319 n.35). As in *Lesinski*, HCSO "derives both the authority and the obligation to [perform the relevant function] directly from the State." 739 F.3d at 604. While this adds some support to Sheriff Chronister's argument, we caution to add that this principle can be taken too far as *every* power the sheriff exercises is ultimately granted by state law. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47, 115 S. Ct. 394, 404 (1994) ("[U]ltimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates. 'Political subdivisions exist solely at the whim and behest of their State . . . .'" (alteration omitted) (quoting *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 313, 110 S. Ct. 1868, 1877 (1990))).

20

Considering both the autonomy that the Grant Agreement affords HCSO and the control the state exerts through state-set standards and reporting requirements, we conclude that this factor is neutral.

3.

Although Florida sheriff's offices are generally funded entirely by county taxes, *Stanley*, 843 F.3d at 929, DCF provides all funding for child-protective investigations, and Freyre does not contest this. Thus, this factor weighs in favor of arm-of-the-state status.

4.

This final factor, the most important of the *Manders* calculus,[13] asks us to determine whether the state treasury would be burdened by a judgment against HCSO in this matter. Sheriff Chronister argues that it would, relying almost entirely on the testimony of an HCSO employee, Major Bullara. Bullara avers that "[i]f there were to be a judgment in this matter, it would be paid strictly out of the DCF grant money provided this fiscal year." But there's reason to think that Bullara's assessment is incorrect. First, Florida law provides that Grant Agreement

---

[13] *Rosario*, 506 F.3d at 1046 ("[A]s *Shands* and other Eleventh Circuit cases have noted, the most important factor in determining immunity is who is responsible for judgments against the entity." (citing *Manders*, 338 F.3d at 1325)); *Manders*, 338 F.3d at 1325 (noting that the Supreme Court "weigh[ed] this source-of-payment factor heavily" in *Hess*); *id.* at 1330 (Anderson, J., dissenting) (noting that the Supreme Court "cited with approval the fact that the vast majority of the circuits have concluded that the state treasury factor is 'the most important factor' to be considered" (quoting *Hess*, 513 U.S. at 49, 115 S. Ct. at 405)).

funds are for "providing child protective investigations," Fla. Stat. § 39.3065(3)(c); the statute makes no reference to judgments. Second, Florida law authorizes sheriffs to purchase liability insurance to cover "claims arising out of the performance of his or her duties or the duties of his or her deputies or employees." *Id.* § 30.555. And HCSO acknowledges that it is self-insured under Florida Statutes §§ 768.28(16) and 324.171. Finally, this Court has repeatedly acknowledged that "no provision of Florida law provides state funds to a Florida sheriff to satisfy a judgment against the sheriff." *Stanley*, 843 F.3d at 930 (quoting *Hufford*, 912 F.2d at 1342); *Abusaid*, 405 F.3d at 1312 (same). For these reasons, we conclude that a judgment against HCSO would not be satisfied with state funds and that this factor weighs against arm-of-the-state status.

While this case presents an especially close call, we ultimately conclude that HCSO does not act as an arm of the state when conducting child-protective investigations pursuant to the specific Grant Agreement between HCSO and DCF.

III.

The District Court correctly denied HCSO summary judgment on its sovereign immunity defense, the only issue we review in this interlocutory appeal. We accordingly affirm the District Court's judgment and remand the case for further proceedings.

**AFFIRMED and REMANDED**.

22