[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13124
_____

D.C. Docket No. 1:12-cv-02018-MHC

Michael Leslie LAKE,

Plaintiff-Appellee,

versus

Michael SKELTON,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

Before ED CARNES, Chief Judge, TJOFLAT, HULL, MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JULIE CARNES, and NEWSOM, Circuit Judges.[1]

---

[1] Judge Jill Pryor recused herself and did not participate in the en banc poll.

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting a rehearing en banc, it is ORDERED that this case will not be reheard en banc.

WILLIAM PRYOR, Circuit Judge, joined by BLACK, Circuit Judge, respecting the denial of rehearing en banc:

A majority of the Court has voted not to rehear en banc our decision in *Lake v. Skelton*, 840 F.3d 1334 (11th Cir. 2016), which held that Georgia's sovereign immunity bars a complaint for damages against a deputy sheriff who failed to accommodate a dietary request from an inmate in a county jail in Georgia. The panel faithfully applied the arm-of-the-state test set out in *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc), in this appeal. Our dissenting colleague does not "quarrel with this Court's ruling in *Manders*." Dissenting Op. at 31. Instead, our colleague argues that the panel decision ignored "this Court's express admonitions in *Manders*" and that the opinion "represents a distinct break from the law established" in *Manders*. *Id.* at 34, 14 n.2. But our colleague misreads both *Manders* and the panel's decision. As members of the panel, we write to set the record straight.

## I.    Background

On November 28, 2011, Michael Lake was arrested for stalking a woman named Leslie and detained without bond at the Cobb County Adult Detention Center. The sheriff of Cobb County operates the Detention Center, and Major Michael Skelton served there as operational support commander. There is no

3

difference, for purposes of this appeal, between the sheriff and deputy sheriffs. *Lake*, 840 F.3d at 1342.

Lake requested a special diet to accommodate a religious vow he had made to gain him Leslie's friendship. The jailers denied his request. In response, Lake sued Major Skelton in his official and individual capacities, alleging violations of the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act. The district court granted summary judgment in favor of Skelton in his individual capacity, but it declined to grant summary judgment in favor of him in his official capacity. On appeal, the panel considered only the narrow question whether the sovereign immunity of Georgia extends to Skelton when he is sued in his official capacity for decisions made about the provision of food to inmates. On that question, the panel reversed.

## II.    Discussion

Our decision in *Manders* established the analytical framework for deciding whether a state entity is an "arm of the State" entitled to sovereign immunity. We consider four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309. Applying those factors, the *Manders* Court held that the sheriff of Clinch

4

County, Georgia was "an arm of the State, not Clinch County, in establishing [and implementing a] use-of-force policy." *Id.* at 1328.

Contrary to our colleague's assertions, *Manders* did not decide whether Georgia sheriffs are entitled to sovereign immunity when performing functions other than establishing and implementing force policies. In fact, *Manders* explicitly disclaimed that interpretation, stating that it "d[id] not answer" the question whether a sheriff "wears a 'state hat' for any other functions he performs." *Id.* Our colleague distorts this clear limiting language and argues instead that the *Manders* Court "forcefully swore off its application" to cases, like this one, that involve the provision of food. Dissenting Op. at 14 n.2. In support, our colleague points to a handful of statements *distinguishing* that question. *Id.* at 13–14. For example, the *Manders* Court stated that "obligations involving the jail structure and inmates' food, clothing, and medical necessities . . . involve wholly separate and distinct matters from the sheriff's force policy" and its implementation. *Manders*, 338 F.3d at 1322. Manders "challenge[d] only" the sheriff's force policy and its implementation, so the Court limited its holding to "only . . . the limited functions" of establishing and implementing the force policy.  *Id.* at 1323, 1328. But *Manders* offered no "express admonitions" one way or the other for cases involving the provision of food, dissenting op. at 34; it instead expressly declined to decide the question.

When presented with that question, our panel faithfully applied our precedent. We weighed the four arm-of-the-state factors as dictated by *Manders* and concluded that Georgia sheriffs act as arms of the state when they make decisions about the provision of food. Our colleague argues that the panel incorrectly applied the factors and that its decision was not dictated by precedent. *Id.* at 14–15. But *Manders* itself rejected many of the arguments our colleague raises.

In considering how state law defines the office of sheriff, our dissenting colleague argues that "Georgia law makes absolutely clear that the position of sheriff is defined as an officer of the county, not the state," *id.* at 18, but we decided otherwise in *Manders*. To be sure, we acknowledged in *Manders* that, in the words of our colleague, "[t]he Georgia Constitution expressly designates sheriffs as 'county officers.'" *Id.*; *see Manders*, 338 F.3d at 1312. But instead of holding that the state constitutional label "weigh[ed] heavily against arm-of-the-state status," dissenting op. at 19, we explained that it reflected only "a geographic label defining the territory in which a sheriff is elected and mainly operates." *Manders*, 338 F.3d at 1312. We have since reiterated that sheriffs are "only 'county officers' in the sense that they have a limited geographic jurisdiction." *Pellitteri v. Prine*, 776 F.3d 777, 780 (11th Cir. 2015) (Martin, J.). After reviewing Georgia's Constitution, statutes, and caselaw, the panel followed this precedent

6

and determined that "[t]he Cobb County Sheriff derives his powers from the State and, with the exception of funding, is largely independent of the county." *Lake*, 840 F.3d at 1339; *see Manders*, 338 F.3d at 1312 ("Georgia's Constitution . . . makes the sheriff's office a constitutional office independent from the county entity itself, precludes all county control, and grants only the State control over sheriffs . . . .").

Our dissenting colleague also critiques the panel's analysis of how Georgia law defines the specific function of providing food. Our colleague takes particular issue with how the panel opinion interprets one of the relevant statutes: section 42-5-2 of the Georgia Code. Dissenting Op. at 20–25. That provision makes it "the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention." Ga. Code Ann. § 42-5-2(a).

Our colleague's criticism again misses the mark. As the panel explained, Georgia law clearly requires the sheriff "[t]o take . . . custody of the jail and the bodies of such persons as are confined therein." *Id.* § 42-4-4(a)(1). Thus, the sheriff is the "governmental unit, subdivision, or agency" having custody of inmates in county jails. *Lake*, 840 F.3d at 1340.

None of the cases cited by our colleague undermines this reasoning. The majority of the Georgia cases cited by our colleague evaluate only whether section

42-5-2 waives the state sovereign immunity of the county. *See Tattnall Cty. v. Armstrong*, 775 S.E.2d 573 (Ga. Ct. App. 2015), *overruled on other grounds by Rivera v. Washington*, 784 S.E.2d 775 (Ga. 2016); *Graham v. Cobb Cty.*, 730 S.E.2d 439 (Ga. Ct. App. 2012); *Gish v. Thomas*, 691 S.E.2d 900 (Ga. Ct. App. 2010). As a result, they describe the statute in general terms and do not address, because they had no reason to address, the contours of the duty imposed on the county by the statute.

As the panel explained at length, when the Georgia courts *have* addressed the nature of the duty, they have drawn the same distinction the panel did between the duty to fund and the duty to provide. *Lake*, 840 F.3d at 1341–42. The Georgia courts have specifically considered the duty to provide medical care, another duty imposed by section 42-5-2. In that context, the Georgia Supreme Court has distinguished between the county's duty to *fund* the provision of medical care under section 42-5-2(a) and the sheriff's duty to provide that care. *Bd. of Comm'rs of Spalding Cty. v. Stewart*, 668 S.E.2d 644, 645 (Ga. 2008); *Lake*, 840 F.3d at 1341–42. This panel adopted that reasoning, and *Lawson v. Lincoln County*, 664 S.E.2d 900, 902 (Ga. Ct. App. 2008), a case cited by our colleague, dissenting op. at 22, supports our conclusion. In *Lawson*, the Georgia Court of Appeals stated that the county has a duty "to maintain the inmate, furnishing him food," but explained that "to meet their duty, the county commissioners have 'a duty to adopt a budget

8

making reasonable and adequate provision . . . to enable the sheriff to perform his duties of enforcing the law and preserving the peace.'" 664 S.E.2d at 902 (quoting *Wolfe v. Huff*, 210 S.E.2d 699, 700 (Ga. 1974)).

Our colleague also suggests that dicta in *Manders* as well as a Georgia law requiring counties to build and maintain a county jail suggest that the sheriff provides food to inmates on behalf of the county, dissenting op. at 23–24, but neither argument is persuasive. As discussed above, *Manders* "d[id] not answer . . . whether [a sheriff] wears a 'state hat' for any other functions" outside of establishing and implementing a use-of-force policy. 338 F.3d at 1328. And although Georgia law requires that counties "erect" and "repair" the county jail, Ga. Code Ann. § 36-9-5(a), we explained in *Manders* that "the location where the sheriff's policing function is performed does not automatically transmute the function into a state function or a county function." 338 F.3d at 1319.

*Manders* also forecloses our colleague's remaining arguments on the second, third, and fourth arm-of-the-state factors. Our colleague argues that statutes requiring that inmates be provided with daily meals that comply with state health regulations are insufficient to establish control by the state. Dissenting Op. at 25–27 (citing Ga. Code Ann. § 42-4-32(a) & (b)). But in *Manders*, we concluded that the regulation of "the preparation, service, and number of meals" served in county jails is "evidence of how the duties of sheriffs in Georgia are governed by the State

9

and not by county governing bodies." 338 F.3d at 1317 n.30. Our colleague argues that counties have "significant power to oversee the sheriff's operation of the county jail" because grand juries may inspect and make recommendations about the jail. Dissenting Op. at 27. But *Manders* explained that "[b]ecause the grand jury is independent and equally oversees county governing authorities, it cannot fairly be said that grand juries work at the counties' disposal or act for counties in investigating sheriffs or county jails." 338 F.3d at 1322 n.40. Our colleague argues that the funding factor supports county control because the county pays for the food served in county jails. Dissenting Op. at 28–29. But in *Manders* we held that "[p]ayment of [the sheriff's] budget, when required by the State, does not establish any control by [the county]," and we observed that the county "bears the major burden of funding . . . the jail," including "appropriat[ing] funds for necessities [such as food] to inmates," only "because the State so mandates." 338 F.3d at 1324, 1323. And our colleague argues that the fourth factor, responsibility for adverse judgments, supports county control because the state is not directly liable for judgments against the sheriff. Dissenting Op. at 29–31. But *Manders* considered the same Georgia budgeting scheme and determined that "the liability-for-adverse-judgment factor does not defeat" immunity because paying a judgment out of the budget of the sheriff's office "implicate[s]" "both county and state funds." 338 F.3d at 1328, 1329.

10

Finally, our colleague misstates the impact of the panel opinion when she contends that it will "bar[] suit against sheriffs for virtually any way they violate a jail inmate's rights—from the use of force to the denial of medical care." Dissenting Op. at 34. As a threshold matter, the panel addressed only the provision of food. The panel did not decide whether the sheriff is entitled to sovereign immunity when he provides medical care, and a review of Georgia law might lead to a different result in a case about the provision of medical care. The panel opinion also addressed only a suit seeking money damages for a decision made by a deputy sheriff in his official capacity. It did not address suits against sheriffs or their deputies in their individual capacities. *See Manders*, 338 F.3d at 1308 n.7 (collecting cases). And it does not prevent inmates from seeking injunctive relief against sheriffs or their deputies in their official capacities. *See Lane v. Cent. Alabama Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014).

Far from "achiev[ing] [a] dramatic change in the law," dissenting op. at 15, the panel faithfully applied this Court's en banc precedent in *Manders*. Because the panel opinion is correct, we agree with the decision not to rehear this appeal en banc.

11

MARTIN, Circuit Judge, dissenting from the denial of rehearing en banc:

The Eleventh Amendment to the U.S. Constitution gives states immunity from being sued in federal court. Hans v. Louisiana, 134 U.S. 1, 14–17, 10 S. Ct. 504, 507–08 (1890). The state's immunity, known as sovereign immunity, also extends to public officials when they act as an "arm of the state." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc). But the state's immunity does not protect local governments—such as counties—or their officers. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S. Ct. 568, 572 (1977); Lincoln Cty. v. Luning, 133 U.S. 529, 530, 10 S. Ct. 363, 363 (1890). In this case, Michael Lake sued Major Michael Skelton, who at the time was an employee of the Cobb County Sheriff's Department. The question presented by his case, then, is whether county sheriffs in Georgia function as an "arm of the state," and are thus entitled to Eleventh Amendment immunity, when they feed (or fail to properly feed) people detained in the county jail.[1]

Until our decision in Manders in 2003, this Court always treated a claim against a Georgia county sheriff for operating a county jail as a claim against the county. See, e.g., Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999) (holding that jail inmate's 42 U.S.C. § 1983 claim "against Sheriff Jarvis in his official

---

[1] The defendant in this case, Major Michael Skelton, was a deputy sheriff. Lake v. Skelton, 840 F.3d 1334, 1336 (11th Cir. 2016). But as the panel noted, "a deputy receives all of his powers and obligations . . . from the sheriff." Id. at 1342. Therefore, like the panel, I refer to the office of county sheriff, which in this case includes the sheriff's deputy.

12

capacity is a claim against DeKalb County"). That meant we never granted county sheriffs the immunity the Eleventh Amendment affords the states. Then, in Manders, we changed course. And that course established a four-factor test for deciding whether a county sheriff acts as an "arm of the state." See Manders, 338 F.3d at 1309. The Manders court then applied the test it created to decide that a Georgia county sheriff does act as an "arm of the state" when implementing a use-of-force policy at the county jail. Id. at 1319, 1328.

Although Manders granted county sheriffs Eleventh Amendment immunity for suits involving their use-of-force policies, the en banc Court made absolutely clear that its holding would not extend to a case involving "feeding, clothing, or providing medical care to inmates"—the basic necessities enumerated in § 42-5-2 of the Georgia Code. See id. at 1319; see also O.C.G.A. § 42-5-2(a). The Manders court took great pains to limit its holding to the particular use-of-force function at issue in that case, and to distinguish that function from the duty to provide basic necessities. See Manders, 338 F.3d at 1319 ("This case is not a case of feeding, clothing, or providing medical care to inmates, which necessarily occur within the jail. Instead, it involves Sheriff Peterson's force policy, which happens to be at issue in the jail context in this particular case."); id. at 1322 ("While Georgia counties have obligations involving the jail structure and inmates' food, clothing, and medical necessities, such duties involve wholly separate and distinct matters

13

from the sheriff's force policy at the jail and his training and disciplining of deputies in that regard."); id. at 1323 n.43 ("We stress that this case does not involve medical care, which counties have a statutory obligation to provide to inmates in county jails." (citing O.C.G.A. § 42-5-2)); id. at 1323 ("Manders does not allege that Sheriff Peterson denied him necessities in O.C.G.A. § 42-5-2. Rather, Manders challenges only Sheriff Peterson's force policy at the jail and the training and disciplining of his deputies.").[2]

Despite this Court's repeated observation in Manders that arm-of-the-state status would not be given to a sheriff who failed to give food or the other necessities listed in § 42-5-2, the panel for Mr. Lake's case held that county sheriffs are entitled to Eleventh Amendment immunity in precisely this circumstance. See Lake, 840 F.3d at 1344. But it is not only because we advised against this outcome in Manders that the Lake panel's conclusion is mistaken. Even if Manders had never mentioned § 42-5-2, a straightforward application of the four-part test it developed shows that each factor weighs heavily against granting the sheriff arm-of-the-state status in connection with his feeding of inmates. In reaching its conclusion, the panel misread the relevant Georgia case

---

[2] The composition of this Court has changed since Manders issued in 2003, yet several members of the Court who signed onto the Manders majority opinion, which so forcefully swore off its application to the very facts now presented in Mr. Lake's case, are still active members of this Court. If they had continued to apply the law as stated in Manders, the Lake panel opinion would have been vacated. There should therefore be no mistake about it: the Lake panel opinion represents a distinct break from the law established by the 2003 en banc Court in Manders.

14

law and statutes, and failed to correctly apply this Court's arm-of-the-state precedent.

As a result, the Lake panel opinion is a dramatic expansion of what had until now been a narrow reach of sovereign immunity into the administration of Georgia county jails. For the 50,000 people detained in county jails across the state of Georgia, the consequences of the panel's holding are large. See Pet. Reh'g at 15. Judge Barrington Parker, dissenting from the panel opinion, said it well. He explained that this decision "will leave Georgia counties unanswerable for constitutional violations predicated on their failure to provide food or any of the other necessities required by § 42-5-2." Lake, 840 F.3d at 1345 (Parker, J., dissenting). Under the panel's expansion of sovereign immunity, no person in a county jail will be able to sue his jailer (in the jailer's official capacity) for damages in federal court, even where the jailer violated the law by depriving the inmate of life's most basic necessities: food, clothing, and medical care. The panel achieved this dramatic change in the law without convening en banc. I dissent from this Court's decision to let the Lake panel opinion stand as the law of this circuit.

## I.    BACKGROUND

### A.

Michael Lake made a religious vow in 1997 to abstain from eating meat.

Lake, 840 F.3d at 1336.  In 2011, after he was arrested for stalking, Mr. Lake was

detained without bond at Cobb County Adult Detention Center.  Id. at 1336–37.

The Detention Center is operated by the sheriff of Cobb County.  Id.  A deputy

sheriff, Major Michael Skelton, served as operational support commander at the

Detention Center.  Id. at 1337.  In keeping with his religious vow, Mr. Lake

requested a vegetarian diet.  Id.  The jailers denied his request.  Id.

Mr. Lake sued Major Skelton in his official capacity, alleging that Skelton's

refusal to give him a vegetarian diet violated his rights under the First and

Fourteenth Amendments, as well as the Religious Land Use and Institutionalized

Persons Act, 42 U.S.C. § 2000cc.  Id.  Major Skelton moved for summary

judgment, arguing that he is entitled to the sovereign immunity given to Georgia

by the Eleventh Amendment.  Id.  The District Court denied summary judgment on

this ground.  Id.  This Court reversed on appeal, holding that "the sovereign

immunity of Georgia extends to a deputy sheriff who denies a dietary request of an

inmate in a county jail."  Id. at 1336.

B.

In Manders, this circuit adopted a function-specific approach to the arm-of-the-state analysis: "Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Manders, 338 F.3d at 1308. We consider whether the defendant is an "arm of the state" in his performance of any given function by examining four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Id. at 1309. "Whether an entity functions as an 'arm of the state' is a federal question that we resolve by reviewing how the state courts treat the entity." Ross v. Jefferson Cty. Dep't of Health, 701 F.3d 655, 659 (11th Cir. 2012) (per curiam).

## II. DISCUSSION

A.

The first Manders factor has, in turn, two prongs we must analyze. First we examine how state law defines the "entity" itself. Second we look to how state law defines the particular function at issue. See Manders, 338 F.3d at 1309 ("We first examine the governmental structure of Sheriff Peterson's office vis-à-vis the State and Clinch County under Georgia law."); see also, e.g., Stanley v. Israel, 843 F.3d 920, 926 (11th Cir. 2016) (considering, as part of the first factor, whether "state

17

law defines sheriffs as county officers"); Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs, 405 F.3d 1298, 1305 (11th Cir. 2005) (same).

We start, then, by looking at how Georgia defines the office of a county sheriff. And Georgia law makes absolutely clear that the position of sheriff is defined as an officer of the county, not the state. The Georgia Constitution expressly designates sheriffs as "county officers." Ga. Const. art. IX, § 1, ¶ 3. Sheriffs are elected by the voters of their county, id. ¶ 3(a), and are independent from the executive branch of the state. Compare id. art. IX (addressing "Counties and Municipal Corporations"), with id. art. V (addressing the state's "Executive Branch"); see also Grech v. Clayton Cty., 335 F.3d 1326, 1353 (11th Cir. 2003) (en banc) (Barkett, J., concurring) ("[W]hereas the Alabama Constitution includes sheriffs within an article addressing the executive branch of the state government, Georgia's constitution discusses sheriffs in an article addressing local government."). As the Supreme Court of Georgia explained long ago, "the sheriff function[s] with reference to State matters, as well as county matters; but they are not regarded as State officers." Truesdel v. Freeney, 197 S.E. 783, 786 (Ga. 1938). Because each sheriff represents, and is answerable to, the voters of the county where he was elected, he acts on behalf of the county and carries out its will. Recognizing this, the Georgia courts have always treated claims against county sheriffs in their official capacity as claims against the county, as opposed to the

18

state. See, e.g., Gilbert v. Richardson, 452 S.E.2d 476, 478 n.4 (Ga. 1994) ("Although Walker County is not a named defendant in this action, [Sheriff] Millard was sued in his capacity as Walker County sheriff. Accordingly, [plaintiffs'] claims are, in essence, claims against Walker County and Millard may raise any defense available to the county . . . .").[3]

This Court's arm-of-the-state jurisprudence has consistently said that where a state constitution or state supreme court defines sheriffs as county officers, this "weighs heavily against assigning arm of the state status to [the] sheriff." Abusaid, 405 F.3d at 1305–06; see also Stanley, 843 F.3d at 926; Hufford v. Rodgers, 912 F.2d 1338, 1341 (11th Cir. 1990). This logic weighs heavily against arm-of-the-state status here.[4] But the panel opinion ignores this lesson from our precedent when it says the "definition in state law . . . favor[s] immunity." Lake, 840 F.3d at 1339.

Having considered how Georgia law defines the office of sheriff, the next question in the factor-one inquiry is: How does Georgia law define the specific function of providing food to inmates—does the sheriff perform this function on

---

[3] Judge Rosemary Barkett observed when she wrote her 2003 opinion in Grech that there were then no less than thirty-one Georgia cases specifically recognizing sheriffs as officers of the county. See Grech, 335 F.3d at 1355 & n.12 (Barkett, J., concurring) (collecting cases).

[4] Neither is it inconsistent with the opinion I authored in Pellitteri v. Prine, 776 F.3d 777 (11th Cir. 2015). The Pellitteri opinion began its immunity analysis by reiterating that the Manders Court found the first prong weighed in favor of immunity. Id. at 780. This mere reference to Manders in the context of an employment discrimination case brought against a Georgia sheriff does not conflict with how I now seek to apply Manders in the context of providing food to inmates.

behalf of the state or on behalf of the county?  See Manders, 338 F.3d at 1319 n.35 ("The key question is not what . . . powers sheriffs have, but for whom sheriffs exercise that power.").

Section 42-5-2(a) of the Georgia Code establishes the requirement for feeding inmates.  It says plainly: "[I]t shall be the responsibility of the governmental unit . . . having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention."[5]  Mr. Lake pointed to this statute as demonstrating that the county is responsible for feeding inmates, because the county has physical custody of the inmate.  Lake, 840 F.3d at 1340.  The panel said no, instead the "governmental unit" having physical custody of county jail inmates is the sheriff.  Id.  Said another way, the panel deemed the human being who county voters elect to be their sheriff to be a "governmental unit," as that term is used in the statute.  Having recrafted the statute in this way, the panel said § 42-5-2 "imposes directly on the sheriff" the "responsibility . . . of providing food to inmates," id., and since the panel had already designated the sheriff an officer of the state, it said feeding inmates and the other necessities required by § 42-5-2 are now state functions.  So it was by this route the panel arrived at its decision that the first Manders factor weighs in favor of granting arm-of-the-state status.  See id. at 1342 ("[W]e

---

[5] A separate provision specifies that "[a]ll inmates shall be given not less than two substantial and wholesome meals daily."  O.C.G.A. § 42-4-32(b).

conclude that the duty to feed inmates—including the denial of an inmate's dietary request—is not delegated by the county but instead is directly assigned by the state." (quotation omitted)).  However, my review tells me that the panel's interpretation of § 42-5-2 contradicts how Georgia's courts interpret § 42-5-2; how this Court has interpreted that statute up until now; other Georgia statutory provisions that bear on this question; and even what Major Skelton conceded in this action.[6]

This Court has recognized that, in conducting the arm-of-the-state analysis, "the most important factor is how the entity has been treated by the state courts." Ross, 701 F.3d at 659 (quotation omitted).  And the Georgia courts have been clear.  Georgia's appellate courts have uniformly and expressly held that § 42-5-2 imposes an obligation on the county to provide inmates with the necessities required under § 42-5-2.  See Tattnall Cty. v. Armstrong, 775 S.E.2d 573, 577 (Ga. Ct. App. 2015) (en banc) ("OCGA § 42-5-2(a) imposes upon the county the duty and cost of medical care for inmates in its custody." (quotation omitted)),

---

[6] The parties did not dispute that § 42-5-2 imposes a duty on counties—rather than directly on the sheriff—to provide food to inmates detained in county jails.  Both Major Skelton and the Georgia Sheriffs Association (participating as amicus curiae) recognize this to be true.  Defs.' Reply Br. at 8, Lake v. Skelton, No. 1:12-cv-2018-MHC (N.D. Ga. May 4, 2015), ECF No. 117 ("Skelton and Howell agree that Cobb County has a duty under O.C.G.A. §§ 42-4-32, 42-5-2 to provide food to prisoners—including Lake when he was confined in its jail."); Amicus Curiae Br. by Ga. Sheriffs' Ass'n at 5 ("The State of Georgia imposes the responsibility on its counties to maintain and furnish the jail and maintain the inmate.  This fiscal responsibility is discharged by the county through the Office of Sheriff." (citing O.C.G.A. § 42-5-2(a)).  In another recent arm-of-the-state case, where the defendant also conceded one of the Manders factors, this Court ruled that the conceded "factor can summarily be taken in favor of county rather than state status." Stanley, 843 F.3d at 930.  This is what should have happened here.

21

overruled on other grounds by Rivera v. Washington, 784 S.E.2d 775 (Ga. 2016);[7] Graham v. Cobb Cty., 730 S.E.2d 439, 443 (Ga. Ct. App. 2012) (same); Gish v. Thomas, 691 S.E.2d 900, 907 (Ga. Ct. App. 2010) ("OCGA § 42-5-2(a) imposes the duty and the cost for medical care of inmates in the custody of a county upon the county." (quotation omitted)); Lawson v. Lincoln Cty., 664 S.E.2d 900, 902 (Ga. Ct. App. 2008) ("A county also has the duty . . . 'to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention.'" (quoting O.C.G.A. § 42–5–2(a)).[8]  Because the Georgia courts have held that § 42-5-2 imposes the duty of furnishing basic necessities (including food) on the county, the function of providing food to inmates is one that the sheriff carries out on the county's behalf, not the state's.

Our Court made this point clear in Manders.  Citing the Georgia Court of Appeals' interpretation of § 42-5-2, we explained that § 42-5-2 imposes on "counties [] a statutory obligation to provide [basic necessities] to inmates in

---

[7] The Georgia cases interpreting § 42-5-2 all involve the provision of medical care, not food. But as the panel says, the same result that would apply for the deprivation of medical care applies for the deprivation of food. See Lake, 840 F.3d at 1341–42.  Indeed, this is one way the panel's grant of sovereign immunity will have such far-reaching effect.

[8] The panel distinguishes these cases by saying they hold that counties are responsible only for funding the provision of the § 42-5-2 necessities, while making sheriffs directly responsible for providing basic necessities. See Lake, 840 F.3d at 1341 ("[T]he Georgia Court of Appeals, like we do, distinguishes between the duty imposed by section 42-5-2 on a county to fund medical care and the duty of a sheriff to provide medical care.").  This distinction between providing for the needs of inmates and paying for them finds no support in Tattnall or any other of these cases. To the contrary, the Georgia Court of Appeals has consistently said that § 42-5-2(a) "imposes upon the county" both "the duty and cost" of the § 42-5-2(a) necessities.  See Tattnall, 775 S.E.2d at 577 (emphasis added); Graham, 730 S.E.2d at 443; Gish, 691 S.E.2d at 907.

22

county jails." Manders, 338 F.3d at 1323 n.43; see also id. at 1322 ("Georgia counties have obligations involving the jail structure and inmates' food, clothing, and medical necessities."). And we said the same thing (albeit in an unpublished decision) three years later. See Gary v. Modena, No. 05-16973, slip op. at 26–27 (11th Cir. Dec. 21, 2006) ("Given that county governments have a statutory obligation to provide inmates in county jails with access to medical care, Bibb County cannot avoid liability under § 1983 simply by arguing that the Sheriff is subject to the exclusive control of the state."). Thus, the panel's conclusion that § 42-5-2 imposes the duty of furnishing basic necessities directly on sheriffs—and not on the counties—cannot be squared with the Georgia appellate decisions or our own.

Other provisions of the Georgia Code offer guidance on this subject, and the panel opinion fails to heed that guidance too. For example, Georgia law requires each county to build and maintain a county jail, and the county sheriff is tasked with operating the jail on the county's behalf. Specifically, § 36-9-5 says that a county jail is a "necessary county building[]," and "[i]t is the duty of the county . . . to erect [and] repair" the county jail. O.C.G.A. § 36-9-5(a). Section 42-4-1(a) in turn provides that "sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority." Id. § 42-4-1(a) (emphasis added). This statutory language—"sheriffs are jailers of

23

the counties"—makes it perfectly clear that sheriffs act as an agent of the county, not the state, when they carry out the functions necessary to maintain the jail. So even if the panel is right that § 42-5-2 imposes the obligation of providing food directly on the county sheriff, the sheriff would still carry out that function on the county's behalf. County sheriffs are, by statutory command, the "jailers of the counties." Id.

An examination of state-law sovereign immunity cases arising under § 42-5-2 also supports that sheriffs act on behalf of the county when feeding inmates. The sovereign immunity provided under the Georgia Constitution extends to both the state and to counties, but the immunity of the counties is separate and distinct in scope from that of the state. See Gilbert, 452 S.E.2d at 479 ("The Georgia Tort Claims Act was [] enacted to waive the sovereign immunity of the state for the torts of its officers and employees but expressly excludes counties from the ambit of this waiver." (citation omitted)). As a result, one way to see whether, under Georgia law, county sheriffs act as an officer of the state or of the county when they carry out § 42-5-2 functions is to look at the type of state-law sovereign immunity that applies when a county sheriff is sued in state court for violating § 42-5-2. For example, in Tattnall, the Georgia Court of Appeals held that the sheriff was entitled to immunity on the basis of the "county's sovereign immunity," not the state's. Tattnall, 775 S.E.2d at 577; see also Graham, 730

24

S.E.2d at 443 (dismissing § 42-5-2 claim against county sheriff based on the "sovereign immunity of the county or its agents or employees"). The Tattnall court affirmatively set out that the Georgia Tort Claims Act, O.C.G.A. § 50-21-20, which waives the sovereign immunity of the state for the torts of its officers, cannot be the basis for waiving the immunity of county sheriffs because "the legislature expressly excluded counties from the ambit of this waiver." Tattnall, 775 S.E.2d at 576 n.5 (quotation omitted). So it is clear that the Georgia courts consider county sheriffs to be acting on behalf of the county, not the state, when they fail to provide the necessities required by § 42-5-2.

B.

Under the second factor of the Manders test, we ask "what degree of control the State maintains" over the sheriff's function of feeding inmates. Manders, 338 F.3d at 1309, 1320. The panel found this factor to strongly support immunity. See Lake, 840 F.3d at 1342–43. I cannot agree.

The panel finds support for its position in two modest requirements found in Georgia law: (1) the food must meet certain state agency health standards, and (2) inmates must be fed twice a day. Id. at 1342. The Georgia Code requires that "[a]ll aspects of food preparation and food service shall conform to the applicable standards of the Department of Public Health," O.C.G.A. § 42-4-32(a), and further that "[a]ll inmates shall be given not less than two substantial and wholesome

25

meals daily," id. § 42-4-32(b).  These provisions hardly evidence "control."  The state does not regulate nutritional content; when or where meals are served; or whether and how sheriffs may contract with third-party providers.  And, as for the specific food service responsibility at issue in Mr. Lake's case (feeding inmates with special dietary needs), state laws say absolutely nothing.  Working out these types of details is left to the unfettered discretion of the county sheriff.

So long as the food complies with Department of Public Health standards, and the inmates get two meals a day, the county sheriff retains complete autonomy to carry out the function of feeding inmates however he sees fit.  The rule in this circuit is that "[e]stablishing minimum requirements is not sufficient to demonstrate control" for Eleventh Amendment purposes.[9]  Lightfoot v. Henry Cty. Sch. Dist., 771 F.3d 764, 773 (11th Cir. 2014).  Section 42-4-32's generic requirement of compliance with public health standards for two meals a day is precisely the sort of minimum requirement that this Court has said fails to establish state control.  See id.  It falls woefully short of demonstrating "direct and substantial control" by the state over the function at issue.  See Manders, 338 F.3d at 1322.

---

[9] This Court has also held that minimum requirements can be a "strong indicia of state control," but that such indicia are outweighed by the autonomy afforded to county officials.  Stanley, 843 F.3d at 928.  That is the case here, where the state has set minimum requirements on food service, but the sheriff otherwise retains full autonomy to carry out that function.

In contrast to the minimal control given to the state, Georgia law gives county authorities significant power to oversee the sheriff's operation of the county jail. Section 15-12-78 of the Georgia Code expressly requires grand juries to "inspect the sanitary condition of the jails" along with "the treatment of the inmates," and then "make such recommendations to the county governing authorities as may be necessary." O.C.G.A. § 15-12-78. This statute gives "county governing authorities" the power to oversee the sheriff's provision of basic necessities at the county jail—including feeding inmates—and imposes an obligation on the county to "strictly enforce" recommendations about county jail conditions. Id. The panel opinion never mentions this substantial source of county control. Due to the almost complete lack of state control over what and how sheriffs feed inmates, and the statutory mechanism for direct county oversight, the second Manders factor cuts sharply against designating Georgia sheriffs arms-of-the-state.

## C.

The third Manders factor asks "where the entity derives its funds," looking to whether the state or the county pays. Manders, 338 F.3d at 1309. The panel said it analyzed this factor in a way that was "indistinguishable from the application in Manders." Lake, 840 F.3d at 1343–44. With that in mind, the panel said this factor "tilts toward immunity" because "[t]he state pays for some of the

27

operations of the sheriff's office, and the county bears the major burden of funding the sheriff's office because the State so mandates." Id. (quotation omitted and alterations adopted). Here again, the panel opinion missed the mark.

To apply Manders properly, we are required to look at the source of funding not for "the operations of the sheriff's office" in general, id., but rather the source of funding for the particular function at issue—here, providing food to inmates. See Manders, 338 F.3d at 1309 ("[W]e apply the Eleventh Amendment factors to the sheriff's functions in issue: promulgating force policy and training and disciplining deputies in that regard."); see also Abusaid, 405 F.3d at 1310 (applying Manders and asking whether the state "funds the particular function in issue" (quotation omitted and alteration adopted)). That means the simple question here is who pays for the food given to county jail inmates—the state or the county?

No one disputes the answer. It is the county that pays for the food. The Georgia Supreme Court has said unequivocally: "It is the official duty of a board of county commissioners . . . to fix and allow to the sheriff as ex officio jailer 'a sufficient amount for the diet of the prisoners, that their strength and health should not suffer in consequence of any insufficiency of food.'" Lumpkin Cty. v. Davis, 195 S.E. 169, 170 (Ga. 1938) (quoting Bd. of Comm'rs of Jasper Cty. v. Persons, 116 S.E. 538, 539 (Ga. 1923)). This Court expressly accepted this as fact in Manders. See Manders, 338 F.3d at 1323 ("[The] County must . . . appropriate

28

funds for necessities to inmates (such as food, bedding, clothing, electricity, and sanitation)."). And indeed, the Lake panel's analysis of the first Manders factor hinges on the fact that § 42-5-2 imposes "the duty . . . on a county to fund medical care" and the other basic necessities. Lake, 840 F.3d at 1341; see also supra note 6. The Lake panel thus recognized that it is the county that is responsible for paying for food for inmates.[10] Because the sheriff's budget for food for inmates is paid entirely by the county, the third factor weighs decidedly against immunity.

### D.

The fourth Manders factor asks who is responsible—the state or the county—for an adverse judgment against the sheriff. Manders, 338 F.3d at 1309. In this case, like all cases involving Georgia sheriffs, no one disputes that the state is not financially liable for a judgment against the sheriff. See Lake, 840 F.3d at 1344. Instead the sheriff's office pays for an adverse judgment itself, so neither the state nor the county directly pays a judgment against the sheriff. Id. The panel acknowledges the state is not liable for judgments against the sheriff, but concludes only that this "does not defeat immunity." Id. (quoting Manders, 338 F.3d at 1329). This is not the proper way to weigh this factor.

---

[10] Major Skelton also concedes this point. See Br. for Appellant at 14 ("Under O.C.G.A. § 42-5-2(a), counties must buy food for prisoners in county jails. . . . Georgia counties must pay for all operations of their respective sheriffs . . . ."); id. at 26 ("[A] county purchases food and clothing for the sheriff's office to provide prisoners.").

Since Manders this Court has established exactly how the fourth factor should be weighed when a sheriff's office pays for its own adverse judgments, thereby relieving the state of any financial responsibility. For example, in Abusaid, this Court held "the fact that the state is not liable [] weighs heavily against extending the state's Eleventh Amendment immunity to the challenged conduct by the sheriff." Abusaid, 405 F.3d at 1313; see also id. ("[T]he fact that a judgement against the Sheriff in this case would not be paid out of the state treasury is, in itself, a clear marker that the Sheriff is not an arm of the state.").[11] In Pellitteri, this Court noted that an adverse judgment against a county sheriff could potentially have an impact on state funds, but explained that the state is not "required to directly pay for any adverse judgment against the Sheriff's office." Pellitteri, 776 F.3d at 783. Then, citing Abusaid, this Court concluded that "to the extent that the state treasury will be spared here from paying any adverse judgment, this factor weighs in favor of denying immunity." Id.

---

[11] Abusaid applied Manders to Florida county sheriffs. Under neither Florida nor Georgia law does the state pay adverse judgments against county sheriffs. See Abusaid, 405 F.3d at 1312; Manders, 338 F.3d at 1327. And in both states, the only drain on state coffers is indirect. See Abusaid, 405 F.3d at 1312 ("[S]tate funds would be implicated indirectly, since an adverse verdict would diminish the resources available to the Sheriff for law enforcement, requiring state law enforcement to fill the gap." (quotation omitted)); Manders, 338 F.3d at 1327 ("If a significant adverse judgment occurs, both county and state funds are implicated because Sheriff Peterson would need to seek a greater total budget from the county for his office and a greater daily rate from the State for felony offenders serving their state sentences in the county jail."). Thus, the holding in Abusaid—that where there is only an "indirect impact on the state treasury," the fourth Manders factor "weighs decidedly against arm of the state status"—applies equally to cases involving Georgia county sheriffs. See Abusaid, 405 F.3d at 1312.

30

Of course it will <u>always</u> be the case that the lack of state fiscal liability does not necessarily "defeat immunity." <u>See</u> <u>Manders</u>, 338 F.3d at 1329. If all Eleventh Amendment immunity analysis of an entity's fiscal autonomy from the state is reduced to that truism, then we have effectively done away with the liability-for-judgment factor altogether. And this result would turn the entire doctrine of Eleventh Amendment immunity on its head. The Supreme Court has told us that "the vulnerability of the State's purse [i]s <u>the most salient factor</u> in Eleventh Amendment determinations." <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 48, 115 S. Ct. 394, 404 (1994) (emphasis added). After all, the very "impetus for the Eleventh Amendment [is] the prevention of federal-court judgments that must be paid out of a State's treasury." <u>Id.</u> Clearly, since "the Eleventh Amendment's core concern is not implicated" in this case, <u>id.</u> at 51, 115 S. Ct. at 406, the fourth factor—like each of the others—weighs heavily against barring Mr. Lake's case based on sovereign immunity.

## E.

I do not quarrel with this Court's ruling in <u>Manders</u>. My criticism of the <u>Lake</u> panel opinion embraces the holding of <u>Manders</u> and demonstrates how the <u>Lake</u> opinion flies in the face of what this Court said in <u>Manders</u>. But beyond what is wrong with the panel's analysis of each of the four <u>Manders</u> factors, there is another, more fundamental flaw that runs throughout the panel opinion, and that

31

flawed reasoning seems to have begun in the <u>Manders</u> opinion. I had therefore hoped that, if this Court undertook to consider Mr. Lake's case en banc, we could have also addressed this flawed logic that first appeared in <u>Manders</u>.

The <u>Lake</u> panel repeatedly emphasizes as weighing in favor of arm-of-the state status that the sheriff is "independent from [the] [c]ounty." <u>Lake</u>, 840 F.3d at 1338; <u>see also</u> <u>id.</u> at 1339, 1341. The argument goes like this: because the sheriff is independent from the county, the sheriff must be an arm of the state. This mistaken premise, which (again) first appeared in <u>Manders</u>, 338 F.3d at 1319, took hold in the <u>Lake</u> panel decision. I had hoped that this mistaken premise would not become a permanent fixture of this Circuit's arm-of-the-state jurisprudence.

It is true that the sheriff, as an "elective county office[r]," occupies a constitutional office that is largely independent from other county governing authority. <u>See</u> Ga. Const. art. IX, § 2, ¶ 1(c)(1); Ga. Const. art. IX, § 1, ¶ 3; O.C.G.A. § 1-3-3(7). But the county governing authority—which is the county's legislative body and is known as the board of county commissioners— is "not the only institution that acts <u>for</u> the county." <u>See</u> <u>Manders</u>, 338 F.3d at 1343 n.15 (Barkett, J., dissenting) (emphasis added). Not unlike the federal government's separation of powers among coequal branches, Georgia law creates a separation of powers at the county level: the sheriff is an executive officer of the county, and his authority is largely independent of the county's legislative body. <u>See</u> <u>Coffey v.</u>

32

Brooks Cty., 500 S.E.2d 341, 351 (Ga. Ct. App. 1998) (Eldridge, J., dissenting in part) ("The sheriff is not an entity of the State, either as an agency or department. The sheriff is a county officer; however, the sheriff is independent of and not answerable to the governing authorities of the county." (citation omitted)).  "Thus, the sheriff's independence from the county commission should be interpreted not as independence from the county, but rather as independent authority to act for the county with respect to the functions entrusted his office."  Manders, 338 F.3d at 1343 n.15 (Barkett, J., dissenting).

In any event, the panel's focus on the fact that the sheriff is largely independent of the county governing authority gives no aid in the relevant Eleventh Amendment inquiry.  The Eleventh Amendment inquiry is about whether the state controls the sheriff and is financially responsible for his actions.[12] Wherever the sheriff stands within the hierarchy of county control, it is clear that the state exercises essentially no control over his feeding inmates.  The state does not fund the provision of food.  The state is not financially responsible for an adverse judgment against the sheriff.  There is therefore no legal basis for Georgia county sheriffs to be accorded the state's sovereign immunity when they fail to give food to inmates at the county jail.

[12] As Judge Anderson explained in his dissent from Manders: "[The majority] asks the wrong question.  It asks who has the most control, the state or the county.  I submit that the proper question is whether the sheriff has carried his burden of proving that he is an arm of the state.  In other words, the issue is not the state versus the county; rather, the issue is whether the sheriff is an arm of the state vel non."  Manders, 338 F.3d at 1331 (Anderson, J., dissenting).

### III.  CONCLUSION

When <u>Manders</u> granted Georgia sheriffs Eleventh Amendment immunity for claims arising out of use-of-force policies in county jails, this Court was careful to narrowly cabin the scope of that immunity.  The words this Court used in <u>Manders</u> reflected an understanding of what a serious thing it is to expand a doctrine that blocks a whole class of people from vindicating their federal rights in federal court.  Every time we expand the list of sheriff's functions that are immune from suit, we impact tens of thousands of people who are detained in county jails across the state of Georgia.  <u>See</u> Pet. Reh'g at 15.  Most of these people have not yet been convicted of any crime and are presumed innocent.[13]  Yet even in the face of this Court's express admonitions in <u>Manders</u>, the <u>Lake</u> panel opinion bars suit against sheriffs for virtually any way they violate a jail inmate's rights—from the use of force to the denial of medical care.

If a faithful application of this Court's and the Supreme Court's precedents required this result, I would accept it and move on.  But because neither this circuit's precedent nor that of the Supreme Court supports this broad grant of immunity to Georgia county sheriffs, I respectfully dissent.

---

[13] <u>See</u> <u>Manders</u>, 338 F.3d at 1315–17 (describing sheriffs as "custodians of pre-trial detainees" and noting limited classes of sentenced inmates in county jails); <u>see also</u> <u>Keith v. DeKalb Cty.</u>, 749 F.3d 1034, 1039 (11th Cir. 2014) ("The DeKalb County Jail houses over 3,000 inmates.  The overwhelming majority are pretrial detainees."); <u>Detention</u>, Cobb County Sheriff's Office (last visited Sept. 15, 2017), http://www.cobbsheriff.org/detention/ ("The Detention Division is comprised of the Jail, Work Deployment Facility and the Annex. . . .  The Jail is a pretrial facility.").

34