[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-13611

Non-Argument Calendar

_____

RAY SHEPARD,

Plaintiff-Appellee,

*versus*

SHERIFF OF WAKULLA COUNTY FLORIDA, et al.,

Defendants,

ANTHONY PAUL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00429-MW-MJF

_____

Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Ray Shepard sued Deputy Anthony Paul, individually, and the Sheriff of Wakulla County, Florida in his official capacity. Shepard asserted a 42 U.S.C. section 1983 excessive force claim against Deputy Paul and Florida state law claims against both defendants. In this interlocutory appeal, Deputy Paul challenges the district court's partial denial of qualified immunity as to the section 1983 claim and its denial of summary judgment as to the state law claims against him, which the district court also dismissed without prejudice under 28 U.S.C. section 1367(c). After careful review, we affirm the district court's partial denial of qualified immunity, over which we have jurisdiction, and we dismiss the appeal as to the state law claims, over which we lack jurisdiction.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Shepard—parked in a gray Honda with his dog outside of a Dollar Tree store in Crawfordville, Florida on November 16, 2018—was in the wrong place at the wrong time. While he was parked outside with his dog, a woman entered the Dollar Tree

from the parking lot and handed the assistant manager a note, threatening that three armed men would come inside and kill everyone in the store if the manager did not give the woman money. The assistant manager was able to get away from the woman, grab a phone, and lock herself in the store's office. The woman left the store, and the store's other on-duty employee locked the front door.

From the office, the assistant manager called the police, reported what happened, and told dispatch she saw a "dark colored Honda" in the parking lot (the only nearby car), which she believed the woman and three men might be inside. The dispatcher, in turn, told Deputy Paul and several other officers of the threatened armed robbery but erroneously reported that the woman *did* get inside the dark colored Honda and that the three men were also inside the Honda. The officers, including Deputy Paul, responded immediately to the scene.

Meanwhile, unaware of these events, Shepard exited his gray Honda, walked to the front door of the Dollar Tree, discovered the door was locked, and returned to his car to check the store's hours online.

About three minutes after the 911 call, Deputy Paul and the other officers arrived on scene. The officers approached Shepard's Honda from behind with their guns drawn. While another officer repeatedly shouted at Shepard to put his hands up, Deputy Paul approached the passenger side of the Honda with his gun in the "low ready" position in case he needed it, pointing it toward the

ground. Shepard stuck his hands out of the driver's side window. As Deputy Paul got closer to the front end of the Honda, he realized only a white male driver and a dog were inside it.

Deputy Paul crossed to the driver's side of the Honda and opened the car door. At that moment, he saw nothing in Shepard's hands and "was dispelled" of any concern that deadly force would be authorized or needed. Still, Deputy Paul grabbed Shepard's left bicep and tried to pull him out of the vehicle. Shepard, however, was seated with the steering wheel tight against his legs, so "the way [Deputy Paul] was pulling [him] . . . wasn't moving" Shepard. Deputy Paul tried pulling Shepard's left arm at an upward angle towards the back door window, but Shepard was "pinned in," and it just left Shepard injured and "yell[ing] in pain." Shepard asked Deputy Paul, "[w]hat's wrong" and to "[p]lease stop" because he was "in pain."

Instead of stopping, Deputy Paul "continued to take [Shepard's] arm all the way against the back window while [he] was still seated," and then Deputy Paul "bounced the weight of his body against that window repeatedly trying to roll [Shepard] out of the car." Shepard's "arm and shoulder gave," and his elbow and shoulder experienced "severe," "overwhelming pain," as he "begged" Deputy Paul "to please stop." Deputy Paul didn't stop. He bounced again. And again. And again. And again. And again. Until finally one of the other officers came around the car, saw

23-13611              Opinion of the Court                    5

what Deputy Paul was doing, and told him to stop, let off the pressure, and let Shepard out.[1]

After removing Shepard from the car, Deputy Paul placed Shepard's hands behind his back, handcuffed him, and "brought [him] down to the ground to the asphalt on [his] knees." Shepard was unable to brace himself and experienced a "pretty brutal fall." Deputy Paul then pushed Shepard down from his knees onto his chest on the asphalt.

As Shepard lay handcuffed, compliant, and face down on the asphalt, Deputy Paul placed his knee on Shepard's neck, "put[ting] the weight of his body on [Shepard] to the point where [Shepard] could no longer yell and explain the pain that [he] was in." Shepard "had trouble breathing" as Deputy Paul kept his knee on Shepard's neck "for a couple minutes." With Deputy Paul's knee directly on Shepard's neck and his hands at Shepard's hands, Deputy Paul pressed his weight so hard against Shepard's neck that Shepard's head was turned "at an extreme angle" and the "entire right side of [his] face" was "smeared" against the asphalt. His "right cheek, eye, temple, head, [and] chin" all made contact with the asphalt and [he] could just taste the oil," as he lay there under Deputy Paul's weight, unable to speak or move his head.

---

[1] According to Officer Perry Lockhart, the actual removal consisted of about 75 to 80 percent Deputy Paul's efforts to pull Shepard out and about 20 to 25 percent Shepard's assistance.

Eventually, Deputy Paul removed his knee from Shepard's neck, grabbed him by the back of his neck and left arm, lifted him off the asphalt, walked him over to the back of his vehicle, and threw him against the back of the vehicle. Deputy Paul kept Shepard bent over the back of the vehicle until the Dollar Tree employees could identify him. Once they confirmed that Shepard was not the woman who had tried to rob the store, the officers released him from handcuffs and eventually let him go.

After the incident, Shepard had fifteen procedures and a surgeon recommended an additional spinal fusion surgery to address "the damage [that] happened during the incident." He also attended trauma therapy, and his therapist's diagnostic impression was that Shepard "me[t] the criteria for [p]osttraumatic [s]tress [d]isorder."

Shepard sued Deputy Paul individually and the Sheriff of Wakulla County in his official capacity. In the operative complaint, Shepard alleged a 42 U.S.C. section 1983 excessive force claim, a state law intentional infliction of emotional distress claim, and a state law battery claim against Deputy Paul. And he alleged a Florida respondeat superior claim against the Sheriff of Wakulla County.[2]

---

[2] The Sheriff of Wakulla County separately moved for summary judgment. Because that motion is not part of this appeal, we don't address it in any detail; suffice it to say the district court denied it.

Deputy Paul moved for summary judgment, asserting: (1) he was entitled to qualified immunity on the excessive force claim because he committed no constitutional violation of any clearly established law since he had only used de minimis force; (2) the intentional infliction claim failed because the facts of the case "fall well below the threshold" under Florida law for such a claim where the force used was "properly classified as *de minimis* under federal law"; and (3) the battery claim failed because "the force [used] by Deputy Paul was *de minimis*" and because Shepard had failed to allege "bad faith, malicious purpose, or willful and wanton disregard" necessary to overcome Florida official immunity for Deputy Paul.

The district court granted in part and denied in part Deputy Paul's motion. On the section 1983 excessive force claim, the district court granted qualified immunity as to all of Deputy Paul's actions, except as to "whether his alleged use of force in placing his knee on the back of [Shepard]'s neck for several minutes constitutes excessive force." The district court concluded that the "use of force in approaching the car with gun drawn, attempting to remove [Shepard] from his vehicle, and taking him to the ground to restrain him was not in violation of clearly established law." But the district court rejected Deputy Paul's argument that the knee-on-neck restraint was a de minimis use of force.

On the state law claims, the district court denied summary judgment on state law official immunity grounds and on the merits. And it exercised its discretion under section 1367(c) to

relinquish supplemental jurisdiction. The district court explained that, because it had granted partial summary judgment on the excessive force claim, all that remained was "a narrow federal issue" and "multiple state[]law claims against two different [d]efendants." The district court "decline[d] to exercise jurisdiction over [p]laintiff's supplemental state[] law claims" and ordered the claims "DISMISSED without prejudice."

Deputy Paul appeals the district court's interlocutory order.

## STANDARD OF REVIEW

We review de novo our appellate jurisdiction. *See Gov't Emps. Ins. Co. v. Glassco, Inc.*, 58 F.4th 1338, 1342 (11th Cir. 2023). "Whether we have interlocutory jurisdiction to review the denial of summary judgment on qualified immunity grounds depends on the type of issues involved in the appeal." *English v. City of Gainesville*, 75 F.4th 1151, 1155 (11th Cir. 2023) (citation omitted). Where we have jurisdiction, we review de novo the immunity denial. *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1296 (11th Cir. 2021).

## DISCUSSION

On appeal, Deputy Paul asserts that the district court erred in partially denying him summary judgment on the section 1983 excessive force claim, arguing he is entitled to qualified immunity for the use of his knee on Shepard's neck. Deputy Paul also asserts that the district court erred in denying summary judgment on the state law claims, arguing he is entitled to state law official immunity and that Shepard did not raise a genuine dispute of fact as to

23-13611                Opinion of the Court                9

Deputy Paul's liability for intentional infliction of emotional distress or battery.

## A. Interlocutory Jurisdiction

We begin with jurisdiction, as we must. A keystone of our appellate jurisdiction is the final judgment rule, *see* 28 U.S.C. § 1291, under which, "[g]enerally speaking, our Court may only hear appeals from a district court's final order," *Freyre v. Chronister*, 910 F.3d 1371, 1377 (11th Cir. 2018). A denial of summary judgment is generally not a final judgment for purposes of appellate jurisdiction. *Id.* An exception exists, however, for interlocutory challenges to summary judgment denials of qualified immunity "to the extent that [the denial] turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But we cannot consider interlocutory challenges to "evidentiary sufficiency" issues, unless a legal issue is already on appeal. *English*, 75 F.4th at 1155–56 (cleaned up).

We have interlocutory appellate jurisdiction to review the qualified immunity denial here since Deputy Paul challenges whether his application of his knee to Shepard's neck violated Shepard's clearly established Fourth Amendment rights. *Id.* at 1156; *see also Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021) (holding we had appellate jurisdiction to consider challenges to whether a constitutional violation existed and to whether the law had been clearly established).

Shepard argues we lack jurisdiction, contending Deputy Paul merely casts evidentiary sufficiency arguments as legal disputes. *See English*, 75 F.4th at 1156. We disagree. In the district

court and now again here, Deputy Paul argues that the record, when viewed in the light most favorable to Shepard, shows that Deputy Paul used de minimis force to secure a scene, as authorized by *Croom v. Balkwill,* and that the gratuitous-use-of-force line of cases does not clearly establish his force was unreasonable in this context. 645 F.3d 1240 (11th Cir. 2011). These are questions of law over which we have jurisdiction. *See English*, 75 F.4th at 1156 (explaining that questions about whether "certain undisputed conduct violated the Fourth Amendment or whether the law was clearly established" are questions of law while questions about "whether [a suspect]—in fact—posed a danger when [the force] occurred" is a question of fact).

But of course, our jurisdiction over the qualified immunity issue does not give us jurisdiction over all the issues on appeal. This includes the district court's separate discretionary dismissal of the state law claims without prejudice under section 1367(c). We have interlocutory jurisdiction only over the district court's denial of qualified immunity on the section 1983 excessive force claim. That is all.

### B. *The Denial of Qualified Immunity on the Excessive Force Claim*

This brings us to the merits. "Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quoting *Bailey v. Wheeler*, 843 F.3d 473,

480 (11th Cir. 2016)).  To overcome qualified immunity, Shepard must show, taking the record in the light most favorable to him, that Deputy Paul (1) "violated a federal statutory or constitutional right" and (2) "the unlawfulness of [his] conduct" must have been "clearly established at the time" of the violation. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation omitted).

The claim here, that Deputy Paul used excessive force to effect Shepard's seizure, is governed by the Fourth Amendment objective reasonableness standard. *See Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1239 (11th Cir. 2024).  For this, we consider several factors:  (1) the severity of the crime to which the officers responded; (2) "whether the suspect posed an immediate threat to the safety of the officers or others"; (3) "whether he was actively resisting arrest or attempting to" flee; (4) "the need for the application of force"; (5) "the relationship between the need and amount of force used"; and (6) "the extent of the injury inflicted." *Id.* (cleaned up). "[T]his multifactor analysis entails an assessment of the totality of the circumstances." *Id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002)).

Viewing the record in the light most favorable to Shepard, the totality of the circumstances tips far in Shepard's favor.  Deputy Paul was responding to a severe crime:  A threatened store shooting and robbery.  But even under these circumstances, Shepard could not have reasonably posed an immediate threat to Deputy Paul or anyone else after he was on the ground and handcuffed.  And while Deputy Paul may have reasonably believed Shepard

resisted his arrest while being pulled out of the car, it is undisputed that Shepard "wasn't actively resisting arrest or attempting to flee once he was taken to the ground and subdued." Further, even assuming there was a need to use some amount of force to keep Shepard secure while searching for the other suspected potential shooters, Deputy Paul's significant use of force— his knee pressed so hard on Shepard's neck that Shepard's face "smeared" on the asphalt, he "couldn't speak," and "had trouble breathing" for a "couple minutes"—was certainly not proportionate to what was needed. Finally, as a result of the incident, Shepard has undergone fifteen procedures, a surgeon has recommended an additional spinal fusion surgery, and he's attended therapy. Some of that treatment may have been necessitated by aspects of the force for which Deputy Paul was entitled to qualified immunity (i.e., aiming the gun, removing Shepard from the car, etc.). But at the very least, the injuries do not weigh in Deputy Paul's favor. Considering the totality of the circumstances, there is a triable issue as to whether Deputy Paul used excessive force when he held Shepard's neck to the ground with his knee.

Whether the unlawfulness of this force was clearly established under our precedent presents a more difficult question. But we hold that it was. A law is "clearly established" when, at the time of the challenged conduct, "every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (cleaned up). The law can be shown to be clearly established through (1) a "materially similar case," (2) "a broader, clearly established principle that should control the novel facts of the situation,"

or (3) conduct that "so obviously violate[d] the Constitution that prior case law [wa]s unnecessary." *Echols*, 913 F.3d at 1324 (cleaned up). The district court found the law was clearly established based on the second prong: A broader, clearly established principle. We agree.

"[A] broad principle in case law [may] establish clearly the law applicable to a specific set of facts facing a governmental official," if it does so "with obvious clarity" to the point that every objectively reasonable official would know his conduct violates federal law. *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). In other words, "if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional without tying that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle" and "the precise facts surrounding 'X Conduct' are immaterial to the violation." *Id*. "These judicial decisions can control 'with obvious clarity' a wide variety of later factual circumstances." *Id*.

Long before this incident, it was clearly established in this Circuit that "an arresting officer may not use gratuitous force on a non-resisting suspect who no longer poses a threat to his safety." *See Acosta*, 97 F.4th at 1242 (collecting cases back to 1997 to show that the law on this point was clearly established well before 2014); *see also, e.g.*, *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (explaining that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force"). Based on this

principle, the district court concluded, "a reasonable officer would have known at the time of arrest that pinning [Shepard] down with a knee on his neck for several minutes after he was restrained and not resisting and posed no further threat to law enforcement was not lawful." We agree.

Deputy Paul argues that the gratuitous force principle does not apply here because his use of force was de minimis. Emphasizing the need for specificity in the Fourth Amendment context, he asserts that "[n]either the plaintiff nor the district court cited to any case law containing substantially similar facts" that would have put Deputy Paul on notice that his use of force was gratuitous. Instead, he likens this incident to *Croom*, where we held an officer's use of force was de minimis when the officer pushed an elderly, infirm woman to the ground, placed either a foot or knee on the woman's back, and kept her there for ten minutes to execute a search warrant of a suspected establishment of multiple drug-traffickers. 645 F.3d at 1244–45, 1251–52. Deputy Paul argues the line of gratuitous-force cases is distinguishable—and *Croom* is analogous—for three primary reasons. The gratuitous-force cases involved less dangerous offenses, only one restrained suspect, and "truly gratuitous" force for no "legitimate law enforcement purpose."

At the outset, the de minimis-force line of cases, including *Croom*, isn't in tension with the gratuitous-force line of cases. As we have repeatedly explained, the de minimis force "principle has never been used to immunize officers who use excessive and gratuitous force *after* a suspect has been subdued, is not resisting, and

poses no threat." *Saunders v. Duke*, 766 F.3d 1262, 1269–70 (11th Cir. 2014) (emphasis added); *see also Ferraro*, 284 F.3d at 1199–1200 (explaining that "none of our other opinions granting qualified immunity have involved the infliction of such severe and disproportionate force after the arrest had been fully effected, the arrestee completely secured, and all danger vitiated"); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (holding that the "evidential foundation [was] sufficient to raise a question of fact as to whether the officers' actions constituted excessive and not de minimis force" where "evidence suggest[ed] the officers used excessive force in beating [the plaintiff] even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way"). And when a broad principle applies, as it does here, the precise facts surrounding the officer's conduct are "often immaterial to the violation." *See Vinyard*, 311 F.3d at 1351. This is the case here. The distinguishable facts Deputy Paul identifies do not bring this incident outside of the "wide variety of later factual circumstances" the gratuitous-force principle controls. *Id.* Indeed, "[t]hese precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established." *Id.*

Deputy Paul's first contention—that the level of crime he was responding to here was much more dangerous than that in *Hadley*, where officers faced "at most, disorderly conduct"—fails because the gratuitous force principle has never been limited to disorderly conduct or minor crimes. *See, e.g., Priester v. City of Riviera Beach*, 208 F.3d 919, 923 (11th Cir. 2000) (officers responding to a

potential store burglary); *Saunders*, 766 F.3d at 1265 (officers responding to a drug sale).

Deputy Paul's second argument—that our precedent lacks "the environmental risks" at issue here because prior cases involved only one suspect, while Deputy Paul reasonably thought multiple suspects were at large, *see Saunders*, 766 F.3d at 1265–66; *Hadley*, 526 F.3d at 1327–28—again misunderstands our precedent, which did not base its holdings on the fact that there were no other potential suspects or threats. Rather, the relevant inquiry is whether the suspect against whom the officer is applying force still posed a threat to the officer. *See, e.g.*, *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 (11th Cir. 2017) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force *against a suspect who is under control, not resisting, and obeying commands*."). Indeed, in *Smith v. Mattox*, we found force unreasonable when a police officer, who was responding to a tip about three suspects possessing cocaine, broke a non-resisting, though "previously fractious," arrestee's arm. And we did so without mentioning the potential threat of other suspects. 127 F.3d 1416, 1420 (11th Cir. 1997).

Deputy Paul's third and final contention—that, unlike the gratuitous-force line of cases, there were no allegations of "any punches, kicks, or hits" here—falls short because it is the need of force and the amount of force, not the type of force, that matters. *See, e.g.*, *Priester*, 208 F.3d at 923–24, 928 (denying qualified

immunity when an officer released a police dog on a non-resisting plaintiff, resulting in fourteen puncture wounds on both legs from dog bites); *Smith*, 127 F.3d at 1419–20 (denying qualified immunity when an officer broke a non-resisting plaintiff's arm while on the plaintiff's back and handcuffing him). A novel type of force is not one of the "few [material] facts" that could distinguish this incident from the broad legal principle that controls. *See Vinyard*, 311 F.3d at 1351.

While it's true our precedent does not capture the specific situation here, an officer pressing a knee onto the back of a hand-cuffed suspect's neck with so much pressure that the suspect is asphyxiated for minutes is clearly within the "wide variety of later factual circumstances" of the broad principle that "an arresting officer may not use gratuitous force on a non-resisting suspect who no longer poses a threat to his safety." *Id.* at 1351; *Acosta*, 97 F.4th at 1242. And our conclusion in *Croom* that law enforcement placing a knee on a suspect's back to secure a scene with multiple suspects was a de minimis use of force by no means gives officers a free pass to use truly gratuitous force against a subdued, non-resisting suspect who poses no threat. Accepting Shepard's version of the events, as we must, no factually particularized, preexisting case law is necessary for it to be clearly established to a reasonable officer that pressing his full body weight onto the back of a suspect's neck after he is on the ground, subdued, and not resisting, constitutes the kind of excessive force the Fourth Amendment proscribes.

## CONCLUSION

We hold that the district court properly denied summary judgment on the excessive force claim as to Deputy Paul's use of his knee on Shepard's neck, and that we lack jurisdiction to assess its dismissal of the state law claims under 28 U.S.C. section 1367(c).

**AFFIRMED IN PART; DISMISSED IN PART**.